STATE OF CONNECTICUT vs. THE NEW HAVEN & NORTHAMPTON COMPANY.

The charter of a railroad company provided that if the road in its location should intersect any highway, the company should restore it to its former state in such a manner as not to impair its usefulness; and that the railroad should be so located within the town of *H* that in its construction and use it should not interfere with a certain turnpike road so as to obstruct, impede or endanger public travel. The location of the road was to be approved by the railroad commissioners, and a special committee appointed by the Superior Court was to determine whether the company had complied with the requirements of its charter as to the turnpike road. The road was located for two miles in the town of *H* close beside the turnpike, the traveled path of which was in some places changed to make room for the road. The commissioners approved the location, and the committee reported that the company had com-

plied with the requirements of its charter. Thirty years afterwards, when the turnpike had become a town highway, the increase of travel upon the highway, and of the number and speed of the trains on the railroad, had rendered the proximity of the railroad to the highway a much greater injury to the public than it was at first, and the Attorney for the State applied for a mandamus to compel the railroad company to change the location of its road and to restore the highway to its former usefulness.    Held—

1.    That the case was not one of the "intersecting" of a highway by the railroad, that term applying only to the case of a railroad crossing a highway.

2.    That the provisions of the charter were not intended to impose upon the railroad company the duty of removing all danger incident to the operation of the railroad.

3.    That the duty imposed upon the company was not a continuing duty.

4.    That the action of the railroad commissioners and of the special committee was final as to the propriety of the original location of the road and as to the compliance of the company with the requirements of its charter in respect to the turnpike road.

5.    That no further legal duty was imposed upon the company by reason of the increased danger from the increase of travel on the highway and of the number and speed of the trains.

6.    That it did not affect the case that the commissioners and committee had dealt with the questions to be determined by them as questions of property rights, giving notice only to the turnpike company and property owners, and none to the public.    The legislature intended by their action to protect the interests of the public, and if they were not sufficiently secured it was a matter for the legislature and not for the courts.

The writ of mandamus is designed to enforce a plain positive duty, upon the relation of one who has a clear right to have it performed, and where there is no other adequate legal remedy.

APPLICATION for a mandamus; brought to the Superior Court, to compel the defendants, a railroad company, to restore to its former state, or in sufficient manner not to impair its usefulness, a portion of the highway in the town of Hamden, known as the Cheshire Turnpike, and which was interfered with by the location of the defendants' railroad, and to re-locate their road in such a way as not to interfere with the highway or obstruct or endanger travel thereon.

The application alleged that the defendants were required by their charter to make and keep up such a restoration of the highway and that they had disregarded their duty in this respect, and that by reason of the location of the railroad for a long distance in close proximity to the traveled path of the highway, and of the greater number and speed of the trains now run upon the road, the public travel was greatly obstructed

and endangered. The answer of the defendants averred that the road was legally located and constructed in its present place in the year 1847, and had ever since been legally operated where so located and constructed; and that all the requirements of the charter and of the general laws of the state in reference to the matter had been fully complied with, and especially that the location of the railroad and restoration of the highway had been approved by the commissioners of the road and a special committee appointed by the Superior Court for the purpose, whose judgment in the matter was final.

The court made a finding of the facts and reserved the case for the advice of this court.

The facts of the case are more fully stated in the opinion.

*T. E. Doolittle* and *W. L. Bennett*, for the State.

*First.* This application is brought in behalf of the public. The estoppel must be proved against the public. The application alleges, 1st, that the respondents have wrongfully so located their railroad that in its construction and use it has always interfered with the turnpike road of the Cheshire Turnpike Company, so as to obstruct and endanger the public travel thereon; and 2d, that where the railroad intersects said road the respondents have wholly failed to restore the same to its former state or in sufficient manner not to impair its usefulness. It is claimed by the respondents that the approval of the location of the railroad by the commissioners appointed by the legislature, and the certificate of the committee appointed by Judge Storrs, preclude the court from inquiring into these allegations. We reply—

1. The approval of the commissioners appointed by the legislature does not affect the case. In the first place, whatever its effect, as the road at that time was but a line described upon paper by a surveyor, it is apparent that this approval can have no bearing upon questions as to restorations made afterwards by the respondents in the construction of their road, upon intersected highways. This approval was not final even as to the location of the road upon the Cheshire

turnpike. In the third section of the charter provision is made only for notice to land owners, and they alone could be, and were in fact, notified and heard by the commissioners. The Cheshire Turnpike Company was not notified. It was not an owner of land upon the line of the road; but it held a valuable franchise, and its road was a matter of public necessity, and on this account it was entitled to be heard as to the location of the railroad. There was no opportunity for the public to be heard. The land-owners were notified and heard; but the larger portion of the public which used the turnpike road, but owned no land upon the line of the railroad, were not notified or heard.

2. Section sixth of the charter of the respondents provides, 1st, for the restoration of highways intersected by the railroad, and 2d, for the location of the road in regard to the turnpike road of the Cheshire Turnpike Company. And at the end of the section a tribunal is created in the following words: "And said corporation may apply to any judge of the Superior Court, who may by law judge between the parties, who, after notice given, may appoint three disinterested persons to determine whether said corporation has complied with the provisions aforesaid; and if approved by them, their decision shall be final." Now it is an open question whether under this section of the charter a decision by a committee appointed by a judge of the Superior Court could bind the public. But however that may be, the proceedings which were actually had are binding between the turnpike company and the respondents only. The question that the committee was created to answer was, whether the railroad was so located that it would not interfere with the turnpike road. The turnpike company was the only party notified to be heard as to the appointment of the committee, and the only one heard before the committee. It was a matter entirely between the two corporations. The turnpike company had its stockholders to protect, for the railroad, if located near it, might reduce the amount of tolls. If it was the duty of the turnpike company to protect the interest of the public, it is manifest that in regarding its own interest it wholly neglected this

duty.   It acted towards the railroad corporation as if its own pecuniary interests were alone at stake, and having arranged to receive the sum of $2,000 for the right of way and damage, allowed the respondents to do as they pleased.   The respondents were really both plaintiffs and defendants before the committee.   What the respondents did was of no concern to the turnpike company, so long as that company lost no money. But, however convenient and satisfactory this arrangement was to the two corporations, the rights of the public were in no way regarded.   The public had a right to travel over the whole of the highway, and by the provisions of the 6th section of the charter the legislature evidently intended to guard against any infringement of this right, and to insure the safety of the traveling public; and now the very means adopted by the legislature for that purpose are sought to be used by the respondents through a fraudulent agreement with another corporation, to defeat the intention of the legislature. It is evident from the charter itself, that the legislature never contemplated that the railroad should be located upon the highway, but so far from it as not to interfere with the safety of the traveling public.   The public have always used the highway.   Before the turnpike was constructed it was the main street of Hamden.   It is difficult to see why the public should suffer inconvenience and danger without remedy, because the turnpike company for a consideration saw fit to allow the respondents to build their road in the highway.

3.   The certificate of the committee appointed by Judge Storrs does not decide whether the respondents have ever complied with the provisions contained in section 6th of their charter, concerning the restoration of highways intersected by the railroad.   The proceedings upon their face show that they were brought only to decide the question of the location of the road between the two corporations, and there is nothing in the papers tending to show that the committee passed upon the restoration of the highway.   At the time the certificate was given the road was in course of construction.   It was not completed until 1848.

4.   If it had been expressly decided in 1847 that the rail-

road company had restored the turnpike to its former state or in sufficient manner not to impair its usefulness, such decision would not bar us from inquiring whether now they kept the highway in repair. This section of the charter has been repeatedly construed by this court to require, not a single act of restoration, but a new and additional act as often as public convenience or necessity might require. The duty of the corporation is a continuing duty. *Burritt* v. *City of New Haven,* 42 Conn., 174, 197; *English* v. *N. Haven & Northampton Co.,* 32 id., 240; *Cott* v. *Lewiston R. R. Co.,* 36 N. York, 214; *Chicago, Rock Island &c. R. R. Co.* v. *Moore,* 75 Ill., 524.

*Second.* Without the authority of the legislature the railroad company would have no right to interfere in any way with any highway. If the power is given them accompanied by conditions, the conditions must be strictly performed or the railroad will be a continuing nuisance. *Hamden* v. *N. Haven & Northampton Co.,* 27 Conn., 158; *Inhabitants of Springfield* v. *Conn. River R. R. Co.,* 4 Cush., 63; *Commonwealth* v. *Erie & North East R. R. Co.,* 27 Penn. S. R., 339; *Queen* v. *Scott,* 3 Queen's Bench, 543. The powers given them are to be strictly construed. *Commonwealth* v. *Erie & North East R. R. Co.,* 27 Penn. S. R., 339. The conditions upon complying with which the respondents may interfere with the highway in question, are, 1st, that they shall restore it to its former state or in sufficient manner not to impair its usefulness; 2d, that the railway shall be so located that in its construction and use it shall not interfere with the turnpike road so as to obstruct or endanger public travel. If a location was to be selected for the purpose of obstructing and endangering public travel, the present location of the road would be well chosen for the purpose. The center line of the railroad for more than a mile is within the limits of the highway. The surface width of the road bed, without counting the spread of the embankments, is twelve feet. The actual width of their road the respondents have never seen fit to fix. But they have placed in the center of the traveled track of the highway a substantial railing. Can it be supposed that

this location complies with the provision of the charter, which demands that it shall not in any way interfere with the turn-pike? It actually takes the traveled track, diminishes the width of the way, and without regard to accidents, leaves the public, who must use the highway, to avoid the engines and cars as best they may, over the two miles or more of narrowed road. In the case of *Commonwealth* v. *Erie & North East R. R. Co.*, 27 Penn. S. R., 339, the railroad company built their road eighty rods along a country road, under an act which provided that the railroad should be so "constructed as not to impede or obstruct the free use of any public road now laid out, opened or built." The court held that they should remove their railroad wholly from the highway, saying, (p. 366:) "It is idle to talk of laying down a railway in the middle of a common country road, and running locomotives and cars over it constantly without impeding or obstructing the free use of it by the public. The commonest kind of common sense forbids us to believe such a thing at all possi-ble." But the other condition imposed upon the respondents has still less been fulfilled. We have claimed that no tribunal has yet had before it the question whether the respondents restored this highway when intersected by the railroad; and moreover, that the duty to restore is a continuing duty, and that even if performed once, such performance will not debar us from enquiring whether now the highway is in its former state or in sufficient manner not to impair its usefulness. But the highway was not, when the road was completed, restored in sufficient manner not to impair its usefulness. After build-ing their road upon the highway nothing was done to it by the respondents either to alter its course or to protect the public upon it. It remained the same country road without alteration, restoration or change, except that the railroad of the respondents was built upon it, and its usefulness was impaired. It is contrary to common sense to say that a por-tion of a highway can be taken, a railroad with wide spread-ing embankments built upon it, locomotives and cars run over it, and yet the highway be not impaired in usefulness. *Peo-ple ex. rel. Green.* v. *Dutchess & Columbia R. R. Co.*, 58 N.

York, 152, 164. The whole of the highway should be restored and not the traveled track alone. *Judson* v. *N. York & N. Haven R. R. Co.*, 29 Conn., 434. An obstruction placed upon the unworked portion of the highway is a nuisance. *Commonwealth* v. *Boston & Lowell R. R. Co.*, 12 Cush., 254. At the present time the travel, both over the railroad and the highway, has greatly increased. The population has increased, and with it the travel, and the necessity of having a safe and unobstructed road. When the railroad was opened for use the trains were few; now they are many, and run at a higher rate of speed and at irregular hours. The railroad remains in the highway, as before, but it is so used that now, if not when it was made, it impairs the use of the highway. And within a few years the respondents have placed a fence directly in the center of the traveled track of the highway. Not only the portion of the highway taken before, but a greater portion, half even of its traveled track, is now occupied. We claim that under these facts common convenience and necessity demand now, if never before, that the respondents should restore this highway. A new and additional duty now rests upon the respondents created by a change of circumstances. *Burrett* v. *New Haven*, 42 Conn., 197.

*J. S. Beach* and *G. H. Watrous*, for the defendants.

1. Mandamus is a remedy at law available only when there is a clear legal right on the one side and a clear legal duty on the other, and when there is no other remedy. Chief Justice Waite, in *Ex parte Cutting*, (Am. Law Times, March, 1877, p. 36,) says: " The office of a mandamus is to compel the performance of a plain and positive duty. It is issued upon the application of one who has a clear right to demand such a performance, and who has no other adequate remedy." See also High's Ext. Remedies, §§ 7, 8, 9.

2. The defendants' railroad was legally located where it now is. The proviso in section 6th of their charter regarding the Cheshire turnpike was fully complied with. The turnpike company was legally notified of the application for the appointment of and hearing before the special committee,

and no other party was entitled to notice; no other party had any interest in the question to be submitted to the committee. This hearing was closed on the 25th of October, 1847. The location of the railroad in this place had been, as against the public and as against all private parties except the turnpike company, legally fixed on the 19th of November, 1846. The property of the turnpike company being a franchise, and extraordinary in character, the legislature granted to it a special tribunal to pass upon its rights as involved in the location of this railroad. This was the sole object of the proviso to the 6th section of the charter. The public and other private parties had, in connection with the location of the road, the same kind of tribunal and notice which, under the general statutes, are provided in all similar cases. If this proviso is for the benefit of any party besides the turnpike company, then it is for the benefit of all other parties; and the public, including everybody on the line of the location, was entitled to two hearings on the subject of the location of the road on the west side of this turnpike; one before the general commission, and one before the special commission. This would be absurd, and the legislature will not be presumed to have enacted an absurdity. The judgment of the special court, rendered on the 25th of October, 1847, was not obtained by fraud, and the receipt for $2,000, dated December 28th, 1847, (the only evidence offered in support of that claim), does not even tend to show fraud in that judgment. That money was paid for so much of the right of way as was taken from the turnpike company. If it had been paid to extinguish the turnpike franchise, or buy up the control of the stock, there could have been no fraud, for no parties were interested but the parties to the transaction; all other parties were protected by the prior proceedings. The action of these two tribunals being authorized and legal was, and is, final; at least so far as the courts are concerned. *Waterbury* v. *Hartford, Prov. & Fishkill R. R. Co.*, 27 Conn., 146; *Chester* v. *Conn. Valley R. R. Co.*, 41 id., 348, 355. If these positions are well taken, then it follows that the court below erred in receiving testimony as to the location of the railroad.

3.   The town of Hamden claims that, even if the location was originally legal, it has become illegal by reason of what has happened since the location was made.   But the railroad company has done nothing since the location that it has not a right to do.   Surely more and faster and extra trains cannot make the location of the railroad illegal, for when that location was made, and the railroad built, it was intended that there should be such increased use of the road if the public convenience should, as was expected to be the case, require it.  The increase of population cannot, nor can the erection of a railing, make that location illegal.   No other changes can be suggested.

4.   If the location of the railroad ought to be changed it manifestly ought to be done by somebody having the legal power to do it.   The railroad company has no such power. Its power of location was exhausted when its railroad was built on the original location.   The railroad company has not even the legal power to cease to operate its railroad, and mandamus would lie to compel it to go on if it should attempt to stop.   *State* v. *Hartford & N. Haven R. R. Co.*, 29 Conn., 538.

5.   But it is claimed that, even if the road was legally located, and the highway legally "restored to its former condition so as not to impair its usefulness," yet it has not been kept restored.   To this claim there are two answers, each of which is complete.—1st. This language has reference to the highway as a structure, and not to the railroad, and it is not the duty of the defendants to keep the highway restored.   Its continued reparation remains, as it was before, the duty of the turnpike company, or of the town, as the case may be.— 2d. If this duty of restoration includes the railroad as well as the highway, and if the law raises a duty to keep both restored, that does not require or permit any change by the railroad company in the location of either the railroad or the highway.   The most that could be claimed, under this broad view, would be that both the railroad and the highway should be kept as and where they were when restored.   This has been done, and there is no claim that they are not now so

kept. At least there has not been the slightest change in the condition or location of either, unless the erection of a railing as ordered by the railroad commissioners makes a change. But that railing must be presumed by this court to have been properly ordered and hence properly there. If otherwise, its presence there could not invalidate the location of the railroad or impair the restoration of the highway.

6. The real trouble with the people of Hamden is, that their horses when on the highway are sometimes scared by the trains passing on the railroad. But this matter is not an open one. So far as it is an evil growing out of the contiguity of the railroad and highway it is *res adjudicata*. The legislature never intended that the liability of animals to be frightened should defeat the location of a railroad, or that a highway should be deemed not restored, or not kept restored, because animals might be frightened at the sight of passing trains. *Bordentown &c. Turnpike Co.* v. *Camden & Amboy R. R. Co.*, 2 Harrison, 314; *Baltimore &c. Turnpike Co.* v. *Union R. R. Co.*, 35 Maryl., 224. There is not a railroad in the country that is legally located, nor a highway that is legally restored, if such was the intention of the legislature, for there is not a railroad in the country at sight of whose passing trains animals are not more or less frightened while on the highway. Whether the railroad intersects a highway, or passes alongside of, or even in sight of it, the effect on animals is the same. These are evils inseparable from having railroads, and yet the benefits are greater than all the incidental evils. If, however, the evil becomes great the legislature has provided a remedy which is entirely effectual and which does not destroy the railroad. Gen. Stat., p. 237, § 36. In this particular case the legislature in 1875 passed a law providing for the supposed danger in the precise locality to which these proceedings have reference. Special Laws, 1875, p. 185.

CARPENTER, J. Over thirty years ago the defendants were duly incorporated, and authorized to lay out and construct a railroad along or near the line of the Farmington Canal from

New Haven northerly to the town of Farmington. The road was located in 1846. The location in the town of Hamden was very near a highway, then the Cheshire turnpike road, and now an ordinary town road, which location was approved by the board of commissioners appointed for that purpose by the General Assembly. · The road was constructed as located, and has been in operation since 1848.

The State's Attorney for New Haven County now files an application for a mandamus.

After alleging the powers and duties of the railroad company in locating and constructing their railroad with reference to highways generally, and with reference to the Cheshire turnpike road in particular, he avers that said corporation in constructing their railroad through the town of Hamden located and constructed the same so that it intersects and crosses the road of the Cheshire Turnpike Company, and that portion of the same which had been constructed upon an ancient highway; and that it ran and still does run along and upon said highway for a distance of more than two miles; that said corporation did not then and have not since restored said road to its former state, or in sufficient manner not to impair its usefulness, but left the same and have ever since suffered and allowed the same to remain and become out of repair, in dangerous condition, and impaired in usefulness; that said corporation did not so locate their railway that in the construction, completion, use and occupation thereof, it should not in any way interfere with the said turnpike road, so as to obstruct, impede or endanger the safety of the public traveling thereon, but so located the same that in its construction, completion, use and occupation, it then was, ever since has been, and now is, an interference with the said road, so as to obstruct, impede, and endanger the safety of the public traveling thereon. The Attorney then prays for a mandamus commanding the defendants to restore said highway to its former state, or in sufficient manner not to impair its usefulness, and to keep the same in its former condition, or in such condition that its usefulness is not impaired; also " to so locate their said railroad that in the construction, completion, use

and occupation thereof, it shall not in any way interfere with said turnpike road, so as to obstruct, impede or endanger the safety of the public in traveling thereon. The defendants, in answer to said application, set up the proceedings in the location and construction of the railroad, the action of the railroad commissioners thereon, and the action of a special committee appointed by a judge of the Superior Court, according to the provisions of the charter, to determine whether the defendants had complied with their charter in regard to said turnpike road.

The Superior Court, after stating the formal and undisputed facts alleged in the application and answer, finds as follows: —"That the location of said railroad in relation to said turnpike between the termini aforesaid is now, at the time thereof was, and ever since has been, such that the use and occupation thereof by transporting persons and property thereon, by the power and force of steam, do expose persons traveling upon said turnpike to the danger of accident by their horses becoming frightened, and if, within the meaning of the defendants' charter, this makes said railroad obstruct, impede or endanger the safety of the public traveling on said highway, then I find that said railroad does obstruct, impede or endanger the safety of the public traveling on said highway; and if the foregoing facts, within the meaning of the defendants' charter, constitute a failure on the part of the defendants to restore said highway to its former state, or in a sufficient manner not to impair its usefulness, then I find that the defendants did fail to restore said highway to its former state, or in a sufficient manner not to impair its usefulness."

The case thus presented is reserved for the advice of this court.

The writ of mandamus is designed to enforce a plain positive duty, upon the relation of one who has a clear legal right to have it performed, and where there is no other adequate legal remedy.

The first question which presents itself for our consideration is, whether it is now the plain positive duty of these defendants to restore the highway to its former condition of usefulness; that is, to remove the danger incident to its use.

The solution of this question depends upon the proper construction and application of the first clause of the sixth section of the charter, (Private Laws, Vol. 4, p. 890,) which is as follows:—"That whenever it shall be necessary for the construction of their single or double railroad or way to intersect or cross any stream of water or watercourse, or any road or highway, it shall be lawful for said company to construct said railroad across or upon the same; but the said company shall restore the said stream or watercourse, or road or highway thus intersected, to its former state, or in sufficient manner not to impair its usefulness."

The railroad does not cross this highway. The word "intersect" ordinarily means the same as to cross; literally to cut into or between. The two words seem to be used in the same sense, as is apparent from the fact that the word *intersected* only is used in the 'latter part of the quotation; whereas, if they were used in different senses, we should expect to find the words "or crossed" also used. But if it be conceded that the word "intersect" is to be understood in the sense of touching, or coming in contact with, we think it cannot be extended so as to embrace a case like this, where the lay-out of the railroad covers a portion of the lay-out of the highway without disturbing or interfering with the traveled part of the highway. The word "restore" imports a physical impairment of the road bed itself. It is an apt word when used with reference to such a road, but is inappropriate when used with reference to a road physically complete, and to indicate the removal of an obstruction which has no connection with the traveled path, but is an obstruction only as it is calculated at certain times to frighten horses. If, in any sense, a highway, the use of which is dangerous, may be said to be restored when the danger is removed, it is manifest that such a restoration is not contemplated in this portion of the charter. A large majority of the cases to which this clause applies are road-crossings. Whether the crossing is at grade or effected by means of a bridge, there is usually some change in the construction of the highway which involves a restoration. However complete that restoration may be, the danger

that horses will be frightened still remains. That danger is inevitable wherever the two ways are in close proximity to each other. If there is no crossing, and the road bed itself is undisturbed, no structural restoration is required. Restoration in the sense of removing all danger is impossible.

This clause in the charter therefore was not intended to impose upon the corporation the duty of removing all danger incident to the use of the railroad; consequently, a writ compelling a restoration of the highway must be denied.

The next question is, whether a writ should be granted, as prayed for, compelling the corporation to locate their railroad so as to avoid this danger. The object is to compel the defendants to re-locate their railroad.

The facts of the case more particularly pertinent to this inquiry are the following:—The lay-out of the railroad covers a portion of the western limits of the turnpike the greater part of the way for more than two miles. The space between the center line of the railroad, (which is also the center of the track,) and the east line of the turnpike, varies in width from forty-five to sixty-six feet, except for a short distance where it is only thirty-six feet, and the travel is obliged to pass east of the railroad. Trains run much faster and more frequently than they formerly did, and by reason of the increase of population and business there is more travel on the highway than formerly. On the east of the railroad track and about one rod distant from the center line is a substantial railing, erected by the defendants about three years since by order of the railroad commissioners. In many places for a considerable distance this railing was placed nearly in the center of the then traveled path.

It cannot be denied that this is an unusually dangerous place. It would seem that something ought to be done to make it less dangerous and more convenient for the public. It is not for us however to indicate the remedy. The question is, whether any legal duty now rests upon these defendants to change the location of their railroad. If any such duty exists, it will be found in some statute, public or private.

The charter authorizes the company to locate and construct

within certain limits a railroad. They located the road, the location was approved by the railroad commissioners, and the road was constructed. In exercising the power thus conferred upon them they exhausted it. We find nothing in the charter which authorizes them to re-locate the road or any part of it. Indeed it is not claimed that such power is conferred. But it is strenuously urged that the road was not located and constructed as required by the charter. In the sixth section it is provided "that said railway shall be so located that in the construction, completion, use and occupation thereof, it shall not in any way interfere with the turnpike road of the Cheshire Turnpike Company, so as to obstruct, impede or endanger the safety of the public in traveling thereon." It is now insisted that the use and occupation of the railroad does obstruct, impede and endanger the public. If this was an open question it is difficult to see what answer could be made to this claim. But unfortunately it is *res adjudicata.* The same section further provides :—"And said corporation may apply to any judge of the Superior Court, who may by law judge between the parties, who, after notice given, may appoint three disinterested persons to determine whether said corporation has complied with the provisions aforesaid ; and if approved by them, their decision shall be final."

Pursuant to this provision three disinterested persons were duly appointed by the Hon. William L. Storrs, then a judge of the Superior Court, to determine whether the company had complied with the provisions of the sixth section. The persons so appointed, after hearing the railroad company and the Cheshire Turnpike Company, and after having carefully examined the railroad as located and constructed, concluded a report of their doings in the premises as follows :—"We are of opinion and do find that the New Haven & Northampton Company have so located their said railroad, as that in the construction, completion, use and occupation thereof, it will not in any way interfere with the turnpike road of the said turnpike company, so as to obstruct, impede or endanger the safety of the public in traveling thereon; and we are of the

opinion and do find that said New Haven & Northampton Company have fully complied with the provision of said sixth. section of the act aforesaid, and we do hereby approve of the same."

We can entertain no doubt that after that decision the location of the railroad under the charter was conclusively determined. It is impossible without doing violence to the language used to give to the charter and the proceedings under it any other interpretation. Neither the public nor individuals, unless by legislative action, had any power or right, directly or indirectly, to change or cause to be changed the line of the railroad or any part of it. Nor had the rail-road company itself any such power. The railroad could be located but once and that had been done. Subsequent legislation allowed and provided for certain changes for the purpose of straightening curves and improving the lines of sight, but we are not aware of any enactment which authorized an entire change of the track for two miles, involving as it does the taking of other lands and interfering with individual rights of property; much less do we find in the statute any positive command to make the contemplated change. Hence the duty to do so is not clear, and the power and right to do so are at least doubtful.

We think therefore that this whole matter, including the location of the railroad, its construction, and the effect of operating it upon travel over and along the Cheshire turnpike road, is *res adjudicata.*

The only change which has since taken place is that now a greater number of persons are exposed to the danger and the danger itself is increased by reason of the greater speed and number of trains. But such change of itself, in the absence of further legislation, imposes upon the defendants no plain, positive duty. The increase of danger in the manner indicated and the increase of travel must have been anticipated and considered in the former proceedings. Such increase therefore will not justify the court in compelling the defendants to exercise a doubtful power.

In opposition to this view it is claimed that the powers and

duties of the railroad commissioners and of the special com-
mittee related only to property rights, and that they had
jurisdiction only of questions between the defendants and
persons whose property was affected, and therefore that this
proceeding, instituted as it is in behalf of the public, is
unaffected by the doings of those tribunals.

In support of this claim stress is laid upon the fact that the
commissioners only gave notice to the owners of land taken,
and that the special committee only gave notice to the
Cheshire Turnpike Company, and that the public had no
notice to appear before either of these tribunals.

We cannot doubt that the legislature intended to protect,
as far as practicable, every right and interest, either of indi-
viduals or of the public, which could be affected by the con-
struction and operation of this railroad. Of course it was
foreseen that its operation along its entire length would be
attended with more or less danger. In the country where
population is sparse the danger is comparatively slight.
There the wisdom and vigilance of the commissioners and the
interest of the railroad company to avoid as far as possible
all danger were relied on to secure the construction of the
road in the best place for safety. In the city of New Haven
the charter provides that the company shall construct and use
their road in such manner and subject to such rules and reg-
ulations as the common council of the city shall prescribe.
Between these two extremes is the case of the Cheshire turn-
pike road. There it was obvious that the operation of the
road would be attended with more than ordinary danger.
Hence the special commission was to be appointed to see that
the construction, use and occupation of the railroad near the
turnpike road did not "obstruct, impede or endanger the
safety of the public in traveling thereon." These precautions
the legislature deemed sufficient for the protection of the
public. If now they are found inadequate the remedy is not
with the courts but with the legislature. It will hardly be
contended that the Superior Court upon the complaint of the
State's Attorney has power to compel the company to carry
their road over or under a highway by means of a bridge,

however dangerous such crossing may be. A special act of the legislature was deemed essential for such a purpose in the case of *The Norwich & Worcester Railroad Company* v. *Killingly*, 25 Conn., 402. The case supposed and the case at bar are precisely the same in principle.

It is further contended that the sixth section imposes upon the defendants a continuing obligation; that although the turnpike road may have been restored to its former condition of usefulness, and so left at first that travel thereon was not obstructed or endangered, yet the road in its present state is such that travel thereon is obstructed and endangered and its usefulness is impaired. The authorities cited from our own reports in support of this claim do not fully sustain it. *Burritt* v. *City of New Haven*, 42 Conn., 174; *English* v. *New Haven & Northampton Co.*, 32 Conn., 240. Both these cases arose in the city of New Haven. By a reference to the fifth section of the charter it will be seen that the company is required to "construct and use that part of said road within the limits of the city of New Haven in such manner and subject to such rules and regulations as the common council of said city shall prescribe." By an act of the legislature passed in 1857, amending the charter of the city of New Haven, it is provided that the "court of common council shall have supervision over all bridges crossing railroads in said city, and may from time to time order the widening or repairing of said bridges in such manner and within such times as in their judgment public convenience may require." This act further provides that if any railroad company shall neglect to obey such order, the city may do the act required, and recover the expense of the railroad company. These acts controlled the cases cited, but they have no application to the case at bar.

For these reasons we advise the Superior Court that this application must be dismissed.

In this opinion the other judges concurred.