WALKER LUSBY v. KANSAS CITY, MEMPHIS & BIRMINGHAM RAILROAD CO.

1. RAILROADS. *Location of line. Change of line. Express authority necessary.*

Where the charter of a railroad company, conferring upon it the right of eminent domain, authorizes it to survey, locate and construct its road through and across the state in a certain general direction on the most advantageous route, and requires it to file in the office of the secretary of state a map, showing the general route of the road, as soon as located, and nowhere expressly authorizes a change or relocation of said line, the company, after so locating its line, filing said map and exercising the right of eminent domain in the construction of its road, is without authority to change or relocate its line, unless expressly authorized by statute or nature has interposed some insurmountable obstacle to the further use of the original line. *Railroad Co.* v. *Devaney,* 42 Miss., 555, mentioned, and its authority denied.

2. COURTS. *Court illegally constituted. High Court of Errors and Appeals. Decisions in 42 Miss. Rep. not authority. Stare decisis.*

The decisions contained in the book entitled Mississippi Reports, Vol. 42, being those of a tribunal appointed by a military commander during the reconstruction period, are without binding authority as judicial determinations. save in the cases in which they were rendered.

3. TRESPASS. *Penalty for cutting trees. Code* 1892, §§ 4412. *Decision of de facto court. Reliance of defendant on same. Res adjudicata.*

A defendant is not liable for statutory damages for wilful trespass in entering on land, and cutting trees thereon, when it appears that he relied on the unauthorized decision of a *de facto* appellate tribunal, not previously called in question, which, by its terms, gave sanction to his conduct.

FROM the circuit court of Monroe county.

HON. NEWNAN CAYCE, Judge.

*Robt. E. Houston,* for the appellant.

No express authority to relocate its line appears either in appellee's charter or any other statutory enactment, and it does not arise by inference or implication. 6 Am. & Eng. Enc. L., p. 522; *So. Pac. Railroad Co.* v. *Wilson,* 49 Cal., 396; *Morehead* v. *Little Miami Railroad Co.,* 17 Ohio, 350.

The statutory authority for an additional exercise of the right of eminent domain must be explicitly shown. 6 Am. & Eng. Enc. L., p. 541 (*b*), and authorities cited; Randolph's Law of Em. Dom., p. 182.

Even under the proper and authorized exercise of this right, compensation must precede the taking, or be tendered prior thereto, to relieve the taking of its character as a trespass. Before the taking, or entry for the purpose of taking, can be done without the consent of the owner, there must be a condemnation and assessment according to the provisions of the charter, and a payment, or tender thereof, of the damages assessed, and any entry prior thereto is a trespass. *Railroad Co.* v. *Payne,* 37 Miss., 700; *Railroad Co.* v. *French,* 68 *Ib.,* 22; 6 Am. & Eng. Enc. L., pp. 94, 595; Leading Cases Am. Law Real Property, pp. 423, 465; § 17, Const. Miss., 1890. The difference between § 17, const. 1890, and § 10, art. 1, const. 1869, shows the progress of legislation in the protection of private property from the trespasses of both corporations and individuals.

*W. B. Walker*, on the same side.

The case of *Railroad Co.* v. *Devaney*, 42 Miss., 555, relied on by appellee, is distinguishable from the unbroken line of authorities opposed to appellee's contention. It simply allowed the railroad company to meet an extreme and unusual exigency by changing the site of one of the incidental works of its general undertaking. No effort was made in that case to change or relocate the road itself, as appellee desires to do. But it seems, in that case, even the railroad company was not satisfied with the construction by the court of its charter rights, and went to the legislature and obtained a specific grant of power to make the change.

The grant of the right of eminent domain to a private corporation is a statutory grant, must be strictly construed and cannot be liberally or impliedly extended. 6 Am. & Eng. Enc. L., 522; *So. Pac. Railroad Co.* v. *Wilson*, 49 Cal., 396; *Morehead* v. *Little Miami Railroad Co.*, 17 Ohio, 350.

Appellee claims that the survey in which the trees sued for were cut was made for the purpose of relocating its roadway, if found necessary and expedient, to ascertain if its road was properly located and constructed. We contend that no such authority was expressly given by its charter, nor can be implied. Randolph's Law of Eminent Domain, 522; *Morehead* v. *Wilson, supra*; 6 Am. & Eng. Enc. L., 522, §§ 8, 9 and notes.

*Wallace Pratt* and *Buchanan & Minor*, for the appellee.

1. We maintain that under the powers granted in its charter the defendant company had a right to relocate, and, if necessary, reconstruct its road whenever the best interest of itself and of the public demanded it. Its right of eminent domain was not exhausted by one taking. If events subsequent to the building of the road as first located proved such location or construction to be wrong, and necessarily injurious to the owners of adjacent lands (which was a fact this very plaintiff was then asserting in another action against this defendant for caus-

ing an inundation of his lands), the company had a clear right to relocate or reconstruct its line; indeed, there was a duty incumbent on it to do so.　All this is plainly settled by the case of *Mississippi, etc., Railroad Co.* v. *Devaney*, 42 Miss., 555; *Union Pacific Railroad Co.* v. *Atchison, etc., Railroad Co.*, 5 Am. & Eng. R. R. Cas., 394; 19 Am. & Eng. Enc. L., 830.

The company having constructed its road, and having been sued for an improper location and construction, was not obliged to wait until long experience had demonstrated the impropriety of the location and construction of its road, and large liabilities for damages to adjacent owners of land had accrued, but, on the reasonable suggestion that the road was not properly constructed, had a right to proceed at once to make investigation by surveys to determine whether it must relocate or reconstruct its road.

Plaintiff will not deny that the powers granted to defendant by its charter extend, by implication, to authorize the exercise of the powers specifically granted whenever necessary to the proper maintenance or repair of its road.　In the Devaney case (42 Miss.) the court held that the grant of such a power "invested them with the implied power to take lands *in invitum*, after the location and completion of their road, if there was a necessity for the exercise of this power, for the preservation of some right they would lose without the exercise of it, or for the repair or maintenance of their road."　Page 598.

Defendant's liability, then, for this entry on plaintiff's land in making these surveys is to be determined by the same principle as its liability for entry in making the ordinary preliminary surveys for the original location of the road.　And this liability, it is conceded, is merely to compensate the landowner for the actual damages sustained by him.　The defendant company was not a trespasser in making such surveys, but was on the land of complainant by due authority of law.　The charter authority to enter on lands to make preliminary surveys (Acts 1886, p. 192, par. 2) will extend to protect it from liability as

for trespass in making these subsequent surveys to determine whether a relocation or reconstruction was necessary. *Cushman* v. *Smith*, 34 Me., 247; *Bloodgood* v. *Mohawk Railroad Co.*, 14 Wend., 51; 19 Am. & Eng. Enc. L., 838; 2 Wood on Railroads (Minor's ed.), 894, 948.

"For the mere entry to locate and survey its route, however, and to ascertain the feasibility of a location there, which is not followed by occupation of the land, trespass will not lie, and, unless the statute provides therefor, no damages are recoverable." 2 Wood on Railroads (2d ed.), 894. Where the legislature of a state authorizes an act which, in its natural consequences, may be injurious to the property of another, and prescribes the mode in which damages are to be ascertained, he who does the act is not liable as a trespasser. *Woods* v. *Nashua Mfg. Co.*, 4 N. H., 527; *Lebanon* v. *Alcott*, 1 N. H., 339.

2. The plaintiff must show a wilful trespass in order to recover the penalty. *Perkins* v. *Hackleman*, 26 Miss., 41; *Mhoon* v. *Greenfield*, 52 *Ib.*, 434; *McCleary* v. *Anthony*, 54 *Ib.*, 708; *Cushing* v. *Dill*, 3 Ill., 460.

Argued orally by *J. W. Buchanan*, for the appellee.

WOODS, J., delivered the opinion of the court.

This action was instituted by the appellant in the circuit court of Monroe county for the recovery, in one of the counts of the declaration, of actual damages, and, in the other count, for the statutory penalty for trespass in cutting trees upon appellant's lands. The count for the actual damages was, by the appellant, dismissed in the court below, whereby the right to recover the statutory penalty for the cutting of trees was left as the sole issue to be determined.

Brushing aside all the mere forms of pleading adopted by the parties in reaching and raising this issue, we state at once the defense set up by the appellee, which was and is, in a word, that, because of certain other suits begun by the appellant and

others against appellee to recover for injuries sustained by them
in the flooding of their lands and destroying their crops, be-
cause, as alleged by them in their complaints, of the improper
construction of appellee's line of railway, it became, in the
judgment of appellee, necessary to make fresh surveys over
appellant's lands, with a view to a change and relocation of the
said line, if, after such surveys, it should appear to be neces-
sary to reconstruct or relocate its line of railway, and this right
to resurvey and change and relocate is asserted to be contained
in the grant of its powers contained in its charter.

It thus appears that the great underlying question presented
is, Was the original selection and location of the route, and the
actual construction of the railroad in its entirety many years
ago, final, and was the power to exercise the right of eminent
domain exhausted by the one exercise of it in such original se-
lection and location of the route and the actual construction of
the road ?

It will be necessary to examine the charter of appellee found
in chapter 123, Acts of 1886, and ascertain precisely what
powers were granted, and the extent of the grant.   The second
section of the charter declares the purposes for which the Kan-
sas City, Memphis & Birmingham Railroad Company is formed,
and is in these words, in so far as it is necessary for our pres-
ent examination to quote:

" SEC. 2. The purposes for which said corporation is formed
are the construction, maintenance and operation of a line of
railroad, with one or more tracks, and a telegraph line in con-
nection therewith, extending from some point in DeSoto county,
on the boundary line between this state and the State of Ten-
nessee; thence through and across the State of Mississippi in a
southeasterly direction to a point in the boundary line between
this state and the State of Alabama, and running in the general
direction of the city of Birmingham, in the last named state;
. . . and, for the purposes aforesaid, said corporation is
hereby vested with power: . . .

" (2) To cause such examination and survey for its proposed railroad and telegraph line and branches to be made, as may be necessary for the selection of the most advantageous route, and for such purpose by its officers, agents or servants, to enter upon the lands or waters of any persons; but shall be liable for all damages that may be done thereto by reason thereof. . . .

" (4) To lay out its roads and branches not exceeding one hundred feet in width, and to construct the same; and for the purposes of cutting and embankments, to take as much more land as may be necessary for the proper construction and security of its road and telegraph line, and to cut down any standing trees that may be in danger of falling thereon, making compensation, as hereinafter provided, for land taken for the use of the company. . . .

" SEC. 6. So soon as the corporation shall have located its line or lines or branches authorized by this act, it shall make and file in the office of the secretary of state a map, showing the general route thereof. . . .

" SEC. 7. That the right of way is hereby granted to said company to pass in and through the State of Mississippi, and to enter upon and use, in a continuous width of one hundred feet, all such lands belonging to the state which may be found on the route of said railroad company; and the title to such right of way shall vest in said company, its successors and assigns, and said company is hereby authorized to enter upon and appropriate all such lands or material as may be private property, which may be convenient or necessary for said road, together with not exceeding fifty feet on either side of the center of such road, branches, sidings, switches and turnouts, and, in case the company fails to agree with the owners of such lands or materials upon the price to be paid for the fee simple thereto, or in case the owner is under any disability in law to contract, or is absent from the county where such lands or material are

situated, or is unknown, the company may proceed to condemn such land or materials, as hereinafter provided.''

The eighth and ninth sections of the charter then proceed to provide the mode of condemnation in such cases as are referred to in § 7.

A brief summary and analysis of the foregoing will enable us to see clearly, and to retain in mind, the purposes of appellee's creation, and the powers granted in order to secure the ends of that creation. By the second section of the act, the purposes for which the corporation was formed are declared to be the construction, maintenance and operation of a line of railroad from some point in DeSoto county, on the boundary line between this state and the State of Tennessee, through and across the State of Mississippi, in a southeasterly direction, to a point on the boundary line between this state and the State of Alabama. It will thus be seen that almost unlimited discretion was given the appellee in the selection and location of the route to be adopted. The starting point was at any point in DeSoto county on the Tennessee line, the general course to be taken was southeasterly, and the terminal point might be any spot, south of due east from the place of beginning, on the Alabama line—a range of selection bounded by a line a hundred miles long, perhaps.

By the second subdivision of said § 2, power is conferred to make such examination and survey for the proposed railroad line as might be necessary for the selection of the most advantageous route. By the fourth subdivison of § 2, the corporation was empowered to lay out its road not exceeding one hundred feet in width, and to construct the same. By the sixth section of the act, the corporation was required to file, in the office of the secretary of state, a map, showing the general route to be pursued so soon as the line shall have been located; and, by the seventh, eighth and ninth sections, the power to exercise the right of eminent domain was granted, and the methods of its use prescribed.

In no part of the charter, either as recited by us or else-
where, is there to be found any express grant of any powers
to reselect or relocate the line after the most advantageous
route has been once adopted, nor any hint of power conferred
to change the route shown to have been located and selected by
the map required to be filed in the office of the secretary of
state, and to reconstruct the line, in whole or in part, on any
other route slightly or widely different and distant from the
original line of selection and location and actual construction
of the road.    If any such power to relocate and reconstruct
can be successfully asserted by the corporation, resort must be
had to the doctrine of implied powers.

It will be well to recur for a moment to first principles and
remind ourselves that all grants of power—and pre-eminently
grants of powers of sovereignty—to private corporations are
to be strictly construed; that every doubt as to the proper con-
struction of every such grant is to be resolved against the
grantee, and that, to quote the language of a great English
judge, widely borrowed and approved, "silence is negation."
Thus guarded, it may be safely and wisely conceded that one
original act of selection, location and construction would not
exhaust the power to exercise the right of eminent domain in
those two exceptional classes of cases where a subsequent ex-
ercise of the right is shown clearly to be necessary to subserve
the very ends for which the corporation was created.    The
first of these classes, recognized by us in *Ewing* v. *Alabama
& Vicksburg Ry. Co.*, 68 Miss., and recognized by courts gen-
erally, are cases in which the ends of the corporation's being
imperatively required, not a second condemnation of a new
line and the relocation and reconstruction of another and differ-
ent line of railway, but the securing of additional terminal fa-
cilities for turntables, side tracks, water tanks, station houses,
etc.    Referring to cases of this character, we said in that case:
" We do not forget that grants of power, of the character under
consideration, are to be strictly construed.    But that is not a

strict construction which denies to the agency created the very means which are indispensable to the accomplishment of the ends of its creation. That is the destruction of the agency, and not a construction of the grant of the powers conferred.''

The second class of exceptional cases arises when, not by considerations of the corporation's convenience, or of economy in the expenditure of its moneys, or of a more advantageous location and reconstruction on a new and different line, but by imperious necessity some change of the line must be made, or the road abandoned and the ends of its creation fail of fulfillment because of some insurmountable obstacle interposed by nature to the further operation of the road on its original line. If some appalling cataclysm should swallow in a yawning chasm the right of way, roadbed and track, and leave a bridgeless gulf where solid earth had been, then, in this and in other like cases, the deviation of the line from its original location would be within the implied powers of the charter, because to relocate and reconstruct, to the extent indicated, would be absolutely necessary in order to the accomplishment of the ends for which the corporation was created.

But these classes of cases do not embrace the case presented by the present appeal. Here, in the case in hand, no uncontrollable and not to be foreseen convulsion of the earth had rendered the continued use of the line impossible, nor was there any overpowering necessity which required a new location and reconstruction of the road. It does not appear that, as originally located and constructed, the line was not, as the selection and location by appellee declared it to be by its original action, the most advantageous route. But if the location was not the most advantageous, and if damage had resulted to lands and crops by reason of improper location, yet we are at a loss to conjecture why sufficient culverts, trestles and bridges for the passage of the flood waters would not have prevented such damage, and, in addition, and chiefly, the corporation having once made its election and constructed, and for years

used its road according to such election, is bound thereby. Having elected to take its original route, such election was final, and no change from motives of convenience or expediency or economy could be made without another legislative grant authorizing the change. If, to avoid litigation with adjacent landowners for damages resulting from an original improper location and construction, and not the most advantageous, as may now be thought by the corporation, or others, the railroad company may relocate one or two miles of its line, it is difficult to see why the corporation may not, from motives of expediency, relocate and reconstruct its entire line in Mississippi, for nothing short of prescience will enable anyone to foresee or foretell what a railway corporation might think to be most advantageous, or what means might not be employed to generate the belief in the corporate mind that any given change might be advantageous to it. We can never consent that it is within the already great powers conferred on this corporation, by any sort of strained construction of the rights clearly given, to abandon its original line and begin a new one in DeSoto county ten, twenty or thirty miles from the present initial point, and, changing the southeasterly direction of the line, carry its road through a wholly different region and enter the State of Alabama twenty-five miles from its present point of entrance, for the reason that such new route would seem to be, or in fact really is, more advantageous to the corporation than its original line. Unable to consent to any such violent application of the doctrine of implied power in the case supposed, on principle, we must be equally unable to consent to any resort to implied power to relocate, change and reconstruct a single mile, except in the extraordinary cases where imperious necessity requires deviation from the original line in order that the ends of the corporation's creation may not perish.

It would be amazing if any high authority could now be found holding that a corporation, under such a charter as that of appellee, could continue indefinitely to exercise the state's

sovereign right of eminent domain whenever and wherever it
would be more advantageous to it to change, relocate and re-
construct an established and long used line of railway than to
stand by its original selection, location and construction.    In a
few earlier cases there are intimations not in harmony, appa-
rently, with the views we have advanced.    Perhaps the case
most cited for the false view is that of *Railroad Co.* v. *Deva-
ney*, in the book entitled 42 Miss. Rep.    The case has no
binding authority upon us, nor does the doctrine of *stare decisis*
have any application in the case referred to, nor in any other
case found in the so-called 42 Miss.    The opinions found in
that volume are the utterances of a tribunal appointed by the
military satrap who then ruled in a prostrate commonwealth,
and have no other binding authority upon us than that each
case therein must be regarded as *res adjudicata.*

In that case, an unsuccessful railroad company, having had a
bridge burned across a small stream, the Yalobusha river by
name, and having no money (a very common condition with
men, and not wholly unknown with corporations) with which
to rebuild, abandoned its line, long before located and con-
structed and operated, seized Devaney's lands to the extent of
a right of way, changed the location of its once selected and
long used line, and all on the ground of its poverty—its want
of funds to rebuild its burned bridge—and the tribunal of mil-
itary appointment held that there was manifest necessity re-
quiring a change of location and a reconstruction of the railway
line.    The opinion is unsound, mischievous and at war with
reason and authority.    It purports to be based upon and to fol-
low *Ex parte South Carolina Railroad Co.*, 2 Rich., 434, and
*Railroad Co.* v. *Blake*, 9 Rich., 228, but a careful examination
of those cases discloses that the greater part of the opinion of
the court in the case in 2 Rich. was repudiated as dictum in the
later case in 9 Rich.    But these cases, on their face, demon-
strate that the charter of the railroad conferred ''power and
capacity to have, hold, etc., any lands, etc., which they may

find necessary for the site of the road or branches, or to vary
the plans thereof, etc.,'' and the opinion of the court in 2 Rich.,
followed in 9 Rich., held that the charter conferred authority
to make changes of location in the road, saying: ''It is well
known that the company is continually making deflections and
changes of location in the road, for the purpose of carrying out
their plans with greater advantage to themselves and the public.
The legislature has thought proper to subject these matters to
the judgment of the company, and not that of the court.''

It thus appears that the court rests its opinion in those cases
upon a legislative grant to the railroad company of the right
to make deflections and changes of location in the line of the
road.     Whether the court erred in its construction of the words
of the charter, '' or to vary the plans thereof,'' etc., is not
germane to the discussion.     The striking fact is that the court
upheld the right to change and relocate the line of the railway
in that case on the express ground that the legislature had, in
the charter of the company, conferred that right.

The other cases cited by the tribunal of military creation in
the volume entitled 42 Miss. (those of *N. O. & Carrollton Rail-
road Co.* v. *The Second Municipality of New Orleans*, 1 La.
Ann., 128, and *Knight* v. *Carrollton Railroad Co.*, 9 La. Ann.,
284), when critically scrutinized, offer no support to the views
announced in Devaney's case.     In the opinion of Eustis, C. J.,
in the first-named case, it is said that '' the right to establish
the railroad on Nayades street is granted by the fourth section
of the charter.''     The denial of the company's right was as to
the construction of a turnout on Nayades street, in order to
reach its depot, the court upholding the right.     But all doubt
is removed as to the meaning of the court when we examine the
later case referred to in 9 La. Ann., where the same question
was again considered.     Said Slidell, C. J., in delivering this last
opinion: '' The right of making a turnout to communicate with
the depot on Nayades street was a necessary incident to the use of
the railroad, and was recognized in the decision in 1 La. Ann.,

128. From an inspection of the plan offered in evidence by the defendant, and which is shown to be more accurate than that annexed to the plaintiff's petition, it appears that the whole of the tract is within the parallel lines of Nayades street, although it is true that, by reason of the intersection of Nayades and Calliope streets, a portion of the ground crossed by the track may be said to be common ground, both of Nayades and Calliope streets. The defendants, under a fair interpretation of the charter, cannot be said to have laid the turnout of their track out of Nayades street.'' In the Louisiana cases, also, it is clear as noonday that the right of the railroad was upheld because, in the laying of its turnout, it was clearly within the express grant conferred by the legislature, and, hence, Devaney's case finds no support in these cases.

We are referred by the able counsel of the appellee to 19 Am. & Eng. Enc. L., 830, and the cases there cited. We have carefully examined each case, and not one supports the decision in Devaney's case. The first case cited in the encyclopedia, after citing Devaney's case and the South Carolina cases and the Louisiana cases, which we have already examined, is that of *Atlantic Railroad* v. *H. Louis*, 66 Mo., 228. The question we are considering was not involved in that case, though the Missouri case refers to and quotes from Devaney's case, and adds, with guarded caution: '' We do not refer to that portion of the opinion as approving it, but to show the diversity of opinion on this subject, and that courts of the highest respectability have claimed for railroad companies the right to condemn the lands of individuals to make a change of location of their roads, even after they have been completed and operated.''

*Eel River Railroad* v. *Field*, 67 Cal., 429, holds that, by §§ 465, 467, civil code of that state, the right of eminent domain was not affected by a former purchase of one location where subsequently a more advantageous route could be acquired by condemnation. Reference being had to those sec-

tions of the code of California, the right to "change the line of the road, in whole or in part," is given in express terms.

In *McCartney* v. *Chicago & Evanston Railroad Co.*, 112 Ill., 611, the court, in its opinion, says: "We shall not meddle with the question of the general power of a railroad company to change the line of its once made, in the absence of any power of relocation given by its charter," and then proceeds to quote the ordinance of the city of Chicago and the confirmatory act of the legislature of that state, adding: "It appears to us that there was here full-legislative warrant for the change of location that was made," the correctness of which conclusion cannot be denied by anyone who has examined the ordinance of the city and the act of the legislature of Illinois.

The next case cited by the encyclopedia is that of *Minn. & St. Louis Ry. Co.* v. *St. Paul, etc., R. R. Co.*, 35 Minn., 265. The question here was whether one railroad company which had built a track on the premises of another railroad, under a lease from the latter, might afterwards, by consent of all parties, change the location of its track within the limits prescribed in the lease, and be protected in the use of its changed line against the attack of a subsequent purchaser of rights, properties and fanchises of the lessor company. The answer of the court was in the affirmative, and could not well have been otherwise. There is a second reference to another case in the same volume of Minnesota Reports, *Hewitt* v. *St. Paul, etc., Railway Co.*, 35 Minn., 226. In this case the right of the railway company to change its location, even after it had been located and constructed, was upheld by the court, Gilfellon, C. J., quoting in his opinion the legislative act by which the company was authorized and empowered "to survey, locate, construct, complete, alter, change the location of, reconstruct, maintain and operate a railroad," etc. An express grant of power to change a location and reconstruct a road could hardly be put in ampler or stronger terms.

*In re New York, etc., Railroad Co.*, 88 N. Y., 279, the

power of relocation was given by legislative authority, as the editor of the encyclopedia states, in brackets, as he does likewise in Hewitt's case in 35 Minn., just adverted to by us.

The case of *Mahaska County Railroad* v. *Des Moines Valley Railroad Co.*, 28 Iowa, 437, holds that a railroad company, created under the general laws of that state, and not under charter, may, before the actual construction of the road, change the line or route after it has been once fixed. We have been unable to ascertain, from the report of the case or elsewhere, what the terms of the general law were under which the corporation was organized. Whatever the terms were, the opinion limits the right to change a location once made to a road which has not been constructed.

Reference is also made by the editor of the encyclopedia to *Hoard* v. *Chesapeake & Ohio Railway*, 123 U. S., 222, but an examination will show that the question of the right to a second exercise of eminent domain by a corporation which had once located and constructed its line is not involved or referred to. The syllabus to the case correctly states what the questions involved were, and what was decided, viz. :

1. "The relief prayed for in this case was the construction and maintenance of a piece of railway in specific performance of a contract attached to the bill as an exhibit, but upon examination it appeared that the contract did not call for its construction and maintenance.

2. "If a railway company abandons part of its line, and ceases to maintain a piece of track which it had contracted to maintain, it has the right to do so, subject to the payment of damages for the violation of the contract, to be recovered, if necessary, in an action at law."

It thus appears that none of the cases referred to afford any support to the rule applied in Devaney's case, and several of them do not touch the question even remotely.

The counsel for appellees have invited our attention to the case of *The Central Branch Union Pacific Railroad Co.* v. *The*

*Atchison, Topeka & Santa Fe Railroad Co.*, 5 Am. & Eng. R. R. Cas., 389, as giving countenance to the view we are combating, but the opinion shows this to be a clear misconception. The question there was: Had the Atchison, Topeka & Santa Fe Railroad Co., after the completion of the line of railway authorized by its charter, and after having once condemned lands in the city of Atchison, for depots, side tracks, etc., the right to condemn more land for terminal facilities in that city, which was required for its enlarged and growing business; and the court held that, under its charter, the right of eminent domain was not terminated by the completion of the road, nor exhausted by a single exercise of the power. But this does not touch the question of a relocation and reconstruction of a road, in whole or in part, and is in perfect agreement with what was determined by us in the case of *Ewing* v. *Alabama & Vicksburg Railway Co.*, *supra*.

The only remaining case referred to as opposing the true doctrine is that of the *Cape Girardeau, etc., Macadamized Road* v. *Dennis*, 67 Mo., 438. In this case, the same question was presented which was involved in *Hoard* v. *Chesapeake Railroad Co.*, 123 U. S., 222, already examined by us. Dennis had contracted with the corporation for the construction of its road across his land on a given line, and the road had been partly constructed. The corporation determined not to cross the land of Dennis on the agreed line, and sought to condemn a right of way over his lands on another line. The court held that the corporation might change the location, if it sees fit, subject to the right of Dennis to recover such damages as he might sustain by reason of the breach of the contract.

In turning to the text-writers and decided cases which hold that, where the road has been once located and constructed, in the exercise of the discretion allowed its promoters by charter or by general law, the power of exercising the right of eminent domain is at an end, and that no second choice can be made nor any different line selected, unless expressly authorized by

statute, the array is multitudinous. Time fails us in any citations from them, and we content ourselves by a simple reference to some of them. See Mills on Em. Dom., 58; Randolph's Law of Em. Dom., 160; Pierce on Railroads, 254; Wood's Railway Law, 2d vol., p. 752; *Hartford, etc.,* v. *Hosmer*, 12 Conn., 361; *State* v. *New Haven, etc., Co.,* 45 Conn., 331; *Providence & Worcester Railroad's petition,* 17 R. I., 324; *Brigham* v. *Agricultural Branch Railroad,* 1 Allen, 316; *Mason* v. *Brooklyn City, etc., Railroad,* 35 Barb., 373; *Poughkeepsie Bridge Company's application,* 108 N. Y., 483; *Hudson & Delaware Canal* v. *N. Y. & Erie Railroad Co.,* 9 Paige Chy., 323; *Morris, etc., Railroad Co.* v. *Central Railroad Co.,* 31 N. J. Law, 205; *Morrow* v. *Commonwealth,* 48 Pa. St., 305; *Commonwealth* v. *Pittston Ferry Bridge Co.,* 148 Pa. St., 621; *Moorhead* v. *Little Miami Railroad Co.,* 17 Ohio, 340; *Atkinson* v. *Marietta & Cincinnati Railroad Co.,* 15 Ohio St., 21; *Kenton County* v. *Turnpike Co.,* 10 Bush, 529.

We have already declared that the opinion of the tribunal created not by our constitution and laws, but by a military governor of a subjugated state, is not authoritative upon us, and that the doctrine of *stare decisis* does not apply; but as appellee relied upon it, and naturally and properly as being *res adjudicata,* in cutting the timber, as alleged by appellant in his complaint, the trespass cannot be regarded as wilful or malicious, and appellant was only entitled to actual damages. Having dismissed his demand for actual damages, and not being entitled to the statutory penalty for a wilful trespass, we feel constrained to affirm the judgment of the court below.

We have not thought it necessary to examine and pass upon the action of the court below upon the pleadings generally. but it may be proper to say that the demurrers to the plaintiff's replication, and his amended replication to defendant's second plea, were properly sustained.

*Affirmed.*