JUDGE COFER
delivered the opinion oe the court.
The Bank Lick Turnpike Road Company was incorporated by act of assembly, approved February 6,1839., with authority to construct a road between certain designated points, and to “hold, use, possess, and occupy all such real and personal estate as might be necessary and convenient for the site or route of said road.”
It was also enacted that the width of the road should not be more than forty or less than thirty feet, of which not less than sixteen feet wide “shall be made an artificial road, composed of stone, gravel, wood, or other suitable materials, well compacted and put together in a proper and workmanlike manner, and shall maintain and keep the same in repair.”
Under this charter the company selected the route for its road, acquired the right of way, and constructed the road and opened it to public use, and continued to maintain and keep it in repair and to collect tolls for many years.
In the spring of 1868 the turnpike company entered into a contract with the Louisville, Cincinnati & Lexington Railroad Company, by which the former agreed to surrender to the latter about one mile of its road in consideration of the building of a new piece of road to fill up the gap made by the surrender to the railroad company, and the additional consideration of twelve hundred and fifty dollars in cash, as we suppose, to compensate the turnpike company for loss of tolls occurring between the time the public ceased to use that part surrendered to the railroad company and the completion of the new piece of road.
The gates on the whole road seem about this time to have been opened, but whether voluntarily by the company or by the order of two justices of the peace, as authorized by the charter, for failing to keep the road in repair, does not appear.
On the 24th of December, 1868, two justices authorized one gate to be closed and tolls to be taken at it, “the second *532 gate to remain open until the change made by the railroad company shall be made agreeable to the charter of said turnpike company.” What length of time elapsed between the occupation by the railroad company of that part of the turnpike surrendered to it and the re-opening of the road after the completion of the new piece does not certainly appear, but it is certain that the interruption of travel on account of this arrangement commenced prior to the 1st of September, 1868, and continued until August, 1869.
It does not appear that the railroad company could or would have condemned any part of the turnpike road for its use, and on the record as it now stands it must be assumed that the turnpike company voluntarily surrendered a material part of its road, leaving the public to find a route for travel as best it could for nearly one year, during which time the company' was being compensated by the railroad company for its loss of tolls.
There is an implied undertaking on the part of every corporation that it will render to the public, as far as it reasonably can, that service for which it was incorporated, and that it will not voluntarily disable itself to serve the purpose for which it was created. In consideration of the gwresi-public character of the turnpike company, and on the assumption that its road would be of public utility, and upon no other ground, was it or could it have beeu vested with the power to take private property for its use. Not only this, but the privilege to take tolls can only be sustained in view of an undertaking to render public service. The law not only gave the company the power to exercise the right of eminent domain by taking private property for its use and a right to demand tolls, but prohibited the opening of roads parallel with the turnpike within one mile of it. (Revised Statutes, sec. 28, chap. 103.)
In return for these exclusive privileges there was not only an implied agreement on the part of the company to provide *533 a road and keep it open for public travel, but it was bound by the express language of its charter to do so.
The charter was held subject to the condition that the company would in good faith perform its obligation to the pnblic, and having voluntarily abandoned a material part of its road for nearly or quite a year, during which time it was unable to render the public service for which it was bound, there can be no doubt but its charter was subject to be declared forfeited without the aid of a statute. (Attorney-General v. Petersburg & Roanoke R. R. Co., 6 Iredell, 456; State v. Royalton & Woodstock Turnpike Co., 11 Vermont, 431; People v. Hillsdale & Chatham T. P. Co., 23 Wend. 254.)
But any doubt that might otherwise have existed on this subject is removed by statute. Section 22 of chapter 103 of the Revised Statutes provided that if a turnpike road be unfit for public travel and so remained for four days, the company should be fined fifty dollars for every day it was suffered to remain so; and section 23 of the same chapter provided that if the road was suffered to remain so out of repair for thirty days, upon conviction thereof in the circuit court under presentment of a grand jury, the charter of the company with all its franchises should be adjudged forfeited, and that the right of way should be ordered to revert to those from whom it was obtained, or their heirs or assigns, or the road should be transferred to the county to be kept up as a common county highway, as to the court might seem most just and expedient.
While the company was thus exposed to a proceeding to forfeit its charter, which must have resulted in the loss of all its franchises and property, R. H. Perry, who seems then to have owned nearly all the stock and was treasurer and superintendent of the company, applied to the General Assembly to pass an act to legalize the change in the road already contracted for. The bilj. which he sought to have enacted was resisted, and a meeting of a local public interested in the *534 matter, having been held, sent its representatives, who met with Perry before a committee of the legislature, when a bill was agreed upon as a compromise, which was subsequently passed as an amendment to the charter.
This act legalized the change made in the road, and required the company to make certain improvements on it, and to sell toll-tickets in sums of not less than one dollar at a discount of twenty per cent below the customary rates; to allow persons going to church on the Sabbath and neighborhood funeral corteges to pass without paying tolls. It also required the superintendent of the road to report under oath to ,the County Court of Kenton County, in January and July of each year, the amount expended during the preceding six months for repairs and improvements on the l’oad, and required of the gate-keepers similar reports of the amount of tolls earned, and then authorized the court, in the event the excess of tolls over repairs and improvements exceeded ten per cent per annum on the capital stock of the company, to reduce the tolls so that the net earnings would not exceed that sum.
This act was approved on the 10th of February, 1869, and on the 24th day of April, 1869, after taking legal advice, the directors of the company passed a resolution rejecting the act as an amendment to the charter; but the company proceeded to accept the new piece of road from the railroad company and to open it for travel, and immediately thereafter commenced and up to the trial below had continued to charge and collect tolls for the whole road. It also made the improvements required by the act, sold toll-tickets, and allowed persons to pass free of toll under the circumstances designated in the act.
The superintendent and gate-keepers having failed to make reports as required, the county court was proceeding by rule to compel them to do so, when the company instituted this proceeding in the Kenton Circuit Court to obtain a writ *535 of prohibition. The circuit court on final hearing awarded the writ, and the county court has appealed, and now insists that although the amendment was formally rejected, it was practically accepted, and that the company is bound by its provisions.
There is no doubt but that the acceptance of an amendment, like the acceptance of an original charter, may be proved by showing that the corporation has done corporate acts authorized by the amendment, but which without it would have been unauthorized. We think it is equally clear that unless the amendment in question has been accepted the company had no authority voluntarily to change the location of its road, as was done in this case, and then to charge tolls under its original charter for the use of the new road. Having once exercised its choice in the location of its road, it was bound to keep the road as thus located in repair, unless prevented by some vis major, or by the lawful appropriation pf its road or a part of it by the public.
It may be that if it appeared that the railroad company was in a position to condemn that part of the turnpike which was surrendered and was about to proceed to do so, the turnpike company might lawfully have surrendered without waiting for legal steps to compel it to do so, for in that case the government, having authorized the site of the road to be taken for public use, would thereby impliedly assent to its abandonment by the turnpike company. While we know, as a matter of judicial cognizance, that the Louisville, Cincinnati & Lexington Railroad Company had power to condemn a site for its road, we also know that, as a general rule, general authority to condemn for a roadway will not authorize the condemnation of a highway already constructed by authority of law, which runs longitudinally with that to be established (4 Cush. 63), and we can not therefore presume, in the absence of any evidence tending to establish a necessity for the appropria *536 tion of any part of the Bank Lick Turnpike Road, that the railroad company could have legally done so; and we must therefore hold that the abandonment to the railroad was voluntary, and that the assent of the state to such abandonment can not be presumed.
The change in the road being, as we have seen, illegal, all subsequent corporate acts as to that part changed were illegal and a usurpation of corporate powers, unless such acts were done under the authority of the act in question. (27 Penn. State Reps. 339.) If therefore we decide that the company has not by its acts accepted the amendment, we are forced in effect to decide that it has illegally exercised corporate powers, and extorted tolls from the public to which it had no right, and in addition that it is to-day exposed to a proceeding •whereby all its corporate rights, franchises, and property may be seized and appropriated to the use of the commonwealth. "Where an act or fact is fairly susceptible of two constructions, one lawful and the other unlawful, that which is lawful should be preferred.
Between holding that the company has done an unlawful act, or rather series of acts, which would again expose its property and charter to forfeiture, and holding that it has accepted the act in question, we are constrained to hold the latter, especially as such conclusion is sustained by the conduct of the principal owner of the stock and chief officer of the corporation, whose acts, though not conclusive against the corporation, afford under the peculiar circumstances of this case very strong evidence against it. He is spoken of as owning nearly all the stock, and we may safely assume on the record that he owns enough to make his will a law unto the company.
Perry says the act which he sought to have passed was intended to “justify” the change made under the contract with the railroad company, thus showing that he regarded *537 such change as illegal and needing legislative sanction. It also appears that he agreed to the act which was finally passed as a compromise, and which he evidently regarded as necessary to make the change legal, and which he and the company must have known was necessary to save the charter and property from forfeiture, and to which it can not be supposed he would have consented except for his belief that it was necessary.
Having sought an act to legalize the change, and having consented to the terms of the act which was passed in order to secure the ratification of the change by the legislature, and opened the new road for travel, and collected tolls on it, which can only be justified under the act, we hold that there has been an acceptance of the amendment.
The company having by its conduct accepted the benefits of the act, and thereby avoided the loss of its corporate existence and property through an act of grace on the part of the legislature, must take the act eum onere. (Lyons v. Orange, Alexandria & Manassas Railroad Company, 32 Md. 29; Rex v. Westwood, 20 Eng. Com. Law Rep. 85.)
Wherefore the judgment awarding a writ of prohibition against the appellant is reversed, and the cause is remanded with directions to dismiss the petition.