GARDNER *et al. v.* GEORGIA RAILROAD & BANKING CO.

1. The power granted the Georgia Railroad & Banking Company to condemn private property in the manner prescribed in its original charter as amended by the act approved December 26, 1836 (Prince's Dig. 358), could not legally be, and was not, affected by the passage of the act approved December 18, 1894 (Civil Code, §§ 4657 et seq.), "to provide a uniform method of exercising the right of condemning, taking, or damaging private property."

2. The act of 1836 above referred to, amending the original charter of the Georgia Railroad & Banking Company, was sufficient in scope to authorize that company to take private property by condemnation, and to provide a method of so doing.

3. Under a power granted in the charter of a railroad company to "purchase, and have and hold . . any lands necessary for the site, on and along which to locate . . the aforesaid railroad . . or any branches thereof; or to vary or alter the plan or plans, and of such breadth and dimensions through the whole course of the road and roads, as [the company] may see fit," it was permissible for the company, under proper proceedings, to condemn private property for the purpose of laying a double track and enlarging its terminal facilities.

4. The power to condemn private property conferred by the charter of the Georgia Railroad & Banking Company was not exhausted by its first exercise, but is coextensive with the necessities to meet which it was granted.

5. The cases of *Alabama R. Co.* v. *Gilbert*, 71 *Ga.* 591, and *Savannah R. Co.* v. *Woodruff*, 86 *Ga.* 94, distinguished.

Argued March 24, — Decided April 7, 1903.

Petition for injunction.   Before Judge Brinson.   Richmond superior court.   October 27, 1902.

*William H. Fleming*, for plaintiffs.

*Joseph B. & Bryan Cumming*, for defendant.

CANDLER, J.   This was a suit for injunction in Richmond superior court, brought by Mrs. Gardner and others against the Georgia Railroad & Banking Company.   The allegations of the petition are substantially as follows :   The plaintiffs are the owners of a described tract of land in Richmond county, a portion of which the defendant is seeking to condemn, and in pursuance of that intention it has filed with the ordinary its application for the appointment of appraisers and served plaintiffs with a copy of the application.   The strip of land so sought, if condemned, is to be used by the defendant company for establishing a shifting yard for its cars and for constructing additional facilities outside the city of Augusta.   More than sixty years ago the defendant company definitely located its right of way and constructed its road in pursuance of the power granted in its original charter in 1833 ; and it is not proceeding under the general law of the State for the condemnation of private property by railroads, but under the charter granted it in 1833 and amended in 1836.   "Defendant company, in seeking to condemn private property, must adopt the method prescribed by the Code of Georgia, section 4657 et seq., and can not proceed in the manner set out in its application."   It has no power to condemn plaintiffs' property for the purpose stated by it, or for any other purpose, unless it shall proceed under the general law of the State and accept the terms and conditions em-

braced in the Civil Code, § 2178.    "Whatever power to exercise the right of eminent domain may have been granted to defendant company in its original charter, that power does not survive after the lapse of more than half a century, but was exhausted by its first user in permanently locating the road, sidetracks, and terminal facilities.    The power to condemn private property as granted to defendant in its orignal charter was afterwards repealed, and has not since been restored except as contained in the general law now embodied in the code."    The prayers of the petition were, that the defendant be perpetually enjoined from condemning the land in question, for process, and general equitable relief.    The answer of the defendant admitted its purpose to condemn the plaintiffs' land under its charter power, and that the object of the proposed condemnation was to enable it to lay double tracks and construct additional terminal facilities.    It also admitted that it had constructed a single main line in pursuance of the power granted in its charter of 1833, but contended that in so doing "it did not limit or intend to limit the land to be occupied by it in its legitimate business of a railroad to the land then taken.    It denied that its power to condemn private property had been repealed.    On the hearing of the issues raised by the petition and the answer the court refused the prayer for an injunction, and the plaintiffs excepted.

1. The first question presented for our determination is, whether the right given to the defendant corporation in its charter of 1833, as amended by the act of 1836, was abrogated or repealed by the act of 1894 (Civil Code, § 4657 et seq.), which prescribed a different method of procedure for the condemnation of private property by corporations or individuals seeking to exercise the right of eminent domain.    When this charter was granted, and until the time the Code of 1863 went into effect, it is unquestionably true that the correlative rights and duties of a corporation prescribed by its charter constituted a contract on its part, the obligation of which could not constitutionally be impaired by subsequent legislation. This was decided in the Dartmouth College case, the principles of which, as was said by Chief Justice Waite in the more recent case of Stone *v.* Mississippi, 101 U. S. 816, "have become so imbedded in the jurisprudence of the United States as to make them, to all intents and purposes, a part of the constitution itself."    Following.

this authority, it was held by this court in *State* v. *Georgia R. Co.*, 54 *Ga.* 423, that section 15 of the original charter of the defendant company, providing for a tax of one half of one per cent. per annum on the net proceeds of its investments was a valid, binding contract, and that " the tax act of 1874, taxing the railroads of this State upon the property belonging to them, as other property of the citizens of this State is taxed, is, so far as the Georgia Railroad Company is concerned, as to its railroad and appurtenances, unconstitutional and void." See also *Central R. Co.* v. *State*, 54 *Ga.* 402 (4) ; *Goldsmith* v. *Georgia R. Co.*, 62 *Ga.* 490, 543. The charter of the Augusta & Savannah Railroad Company, which was granted in 1838 and accepted prior to the adoption of the Code of 1863, contained an agreement on the part of the State in regard to taxes, similar to that contained in the charter of the defendant company in the present case; and in *Central R. Co.* v. *State*, 54 *Ga.* 413, the tax act of 1874 was also held invalid as to that company. Section 1636 of the Code of 1863 provided that " In all cases of private charters hereafter granted the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter; " and in section 1637 it is provided that " Private corporations hereafter created, without the reservation of the right of dissolution, and where individual rights have become vested, are not subject to dissolution at the will of the State." And so we must necessarily conclude that the substantial rights and privileges given to the defendant company in its charter of 1833, and as amended by the legislature in 1836, could not be abrogated or repealed by any subsequent legislation.

The plaintiffs in error, while admitting that the rule in the Dartmouth College case protects the defendant company from any legislation the effect of which would be to impair the obligation of the contract with it made in the grant of its charter, contend that the doctrine therein laid down does not affect the act of 1894 so far as it prescribes a method for the exercise by the defendant company of its right to condemn private property ; that the act of 1894 is remedial only, and its only effect is to provide a method for the enforcement of the right to condemn. While in a sense this is true, we think there is also a very substantial right involved. Under the amended charter, the company exercising the State's right of eminent domain obtained a fee-simple title to the land

upon paying the amount awarded by the arbitrators appointed to assess the damages arising out of the condemnation. Under the act of 1894, upon payment of the award of the appraisers, the company would only obtain an easement in the land condemned, and if at any time the company should cease to use the land, the title would revert to the person from whom it was taken. While it may be argued that for all practical purposes the railroad company gets all it wants in securing the right to use the land, there is in law a very substantial difference between an easement and a fee-simple title. Remedial statutes of the kind cited by the plaintiffs in error are those which affect only the course and form of proceedings, but do not affect the substance. Morton v. Valentine, 15 La. Ann, 153. We are satisfied that the act of 1894, so far as it is inconsistent with the exercise of its charter rights, has no application to the defendant company.

2. The second point raised by the bill of exceptions is that "the only section of defendant's charter which granted the power to take or condemn private property, to wit, section 11, Acts 1833, . . was expressly repealed by the act of 1836; and section 15 of the Central Railroad charter, which was substituted therefor, contained no power to take or condemn, but prescribed only a method of procedure, — the power to take or condemn by the Central Railroad being contained in section 14, which section was not included by substitution in the Georgia Railroad charter." The original charter of the company (Acts 1833, p. 256) provided in its eleventh section for the condemnation of private property. An examination of this section shows that it was invalid, and its repeal was probably brought about on account of that fact. It was defective in many respects, and, because of its many failings, the General Assembly, by an act approved December 26, 1836, amended the original charter by providing that the eleventh section thereof "be and the same is hereby repealed, and that in all cases in which disagreement may exist, or may hereafter arise between individuals or incorporations and the Georgia Railroad and Banking Company, as to the right of way or damages to property, the disagreement shall be settled as prescribed in the fifteenth section of an act to amend the act incorporating the Central Railroad and Canal Company of Georgia, approved the 14th day of December, 1835." Prince's Dig. 358. The section of the Central Railroad and Canal Company charter,

to which the amending act referred, was as follows: "When any person shall feel himself aggrieved or injured by the said railroad being cut or carried through his land, or by the use of lumber or other materials from any lands in the neighborhood of said road, or by any other works of the company, or when the said company can not agree with any person through or on whose land the said railway or appendages shall be conducted, or from whose lands timber or other materials shall be taken for the use of said road, as to the damage sustained, the amount of such damage or injury shall be ascertained and determined by the written award of three sworn appraisers, all of whom shall be disinterested freeholders of the county where the land in dispute lies; to be chosen, one by the company, one by such owner if he shall think proper, and one by the inferior court of the county where such land lies, or by any three of the justices of said court in vacation; but if such owner shall decline to appoint an appraiser, then two to be appointed by the inferior court, or three justices thereof in vacation as aforesaid, and one by the said company, the award of whom, in writing, shall operate as a judgment for the amount against the company, and shall be enforced by an execution from the inferior court, with the right of appeal to either party to be tried by especial jury at the next term thereafter of the superior court of said county; and the decision shall vest in the company the fee simple of the land in question, and in the other party a judgment for its value thus ascertained, which may be enforced by the ordinary process of said court. In making the said valuation the appraisers, and in case of appeal the court of appeal, shall take into consideration the loss or damage which may occur to the owner or owners in consequence of the land being taken, or the right of way obstructed, and also the benefit and advantage he, she, or they may receive from the erection and establishment of the railroad or works, and shall state particularly the nature and amount of each, and the excess of loss and damage over and above the benefit and advantage shall form the measure of valuation of the said land or right of way: *Provided*, that no difference or disagreement between the company and any landholder shall operate by injunction or otherwise to suspend the progress of said work, but the same shall in all cases be continued without interruption, on adequate security being given by said company to the landholder to pay such damage as shall be

assessed in manner aforesaid:    *And provided also,* that it do not interfere with the house, mill, or other building or yard enclosure of individuals:    *Provided,* that nothing in the above section shall be so construed as to authorize the appraisers to make any estimate or valuation by which the landholder shall become indebted to the incorporation:    *Provided,* five days' notice shall be given to the owner of such land of the time and place of trial."

We think a careful reading of the various acts involved will show that the General Assembly of 1836 had no intention of taking from the defendant company the right to condemn private property for its use in serving the public; and we also think that the language of the transferred section, taken in connection with that of the act making the transfer, was sufficient as furnishing both the power to condemn and the method of procedure to enforce it.    That it was the legislative intention to give this power to the defendant company is apparent upon an examination of the various acts passed by the same body contemporaneously with the one now under consideration, incorporating other similiar companies in every section of the State.    See act to amend the act incorporating the Chattahoochee Railroad Company, approved December 29, 1836 (Prince's Dig. 359); act incorporating Flint and Chattahoochee Railroad, approved December 30, 1836 (Prince's Dig. 367); act incorporating St. Marys and Columbus Railroad Company, approved December 30, 1836 (Prince's Dig. 375); act providing for the construction of the State railroad, approved December 21, 1836 (Prince's Dig. 355).    The people of the State felt the need of railroads, and this legislature was doing all in its power to supply that need by encouraging railroad construction.    It was clearly the intention of all the acts cited to give to the companies being incorporated the power to take private property upon payment of its value to the owner whenever there was a failure of the company and the owner to agree on the amount to be paid.    In the act of 1833 an abortive attempt to confer this power was made.    In 1836 it was the evident purpose to give to this company the same rights which had been given to companies being organized for similar purposes in other sections of the State.

3.    It is further contended that the defendant has no charter power to condemn private property for the construction of a double track on its main line and for securing additional terminal facili-

ties outside the corporate limits of Augusta, the eastern terminus of its line of railroad.   We think that a reasonable construction of the tenth section of the incorporating act fully authorizes the condemnation of the land in question for the purposes set forth in the application to the ordinary.   That section empowers the defendant to "purchase, and have and hold, in fee simple or for years, to them and their successors, any lands, tenements, or hereditaments that they may find necessary for the site, on and along which to locate, run, and establish the aforesaid railroad and railroads, or any branches thereof; or to vary or alter the plan or plans, and of such breadth and dimensions through the whole course of the road and roads, as they may see fit."   The same section also authorizes the defendant company to secure in like manner any lands contiguous to the railroad and railroads " that may be found necessary for the erection of toll-houses, storehouses, workshops, barns, stables, residences, and accomodations for servants or agents or mechanics, and for the stationing and sustaining all animals of labour;" while the substituted section to which we have already had reference gives the power and prescribes the procedure for condemning land for the purposes mentioned, upon failure of the parties to agree as to the price to be paid for the land.   It may be attributing to the men who composed the General Assemblies granting these rights to the defendant company more than prophetic foresight to hold that they intended to provide, seventy years in advance, for the necessities of a twentieth-century railroad, the development of which, within a third of that time, has far surpassed the wildest dreams of the most visionary theorists; but a thoughtful examination of the various railroad charters granted by the legislature at and about the time of the one now under consideration discloses that there must have been in the minds of the framers of those instruments a distinct expectation of the wonderful progress that has characterized the generations that succeeded them.   We shall not give so limited a construction to one of their acts as to make it appear that we discount their foresight as to the future greatness of the State, in the ultimate development of which they showed such complete faith.   Possibly, in providing for the "altering and changing of plans," and the securing of "privileges in waters and in water routes" on which this company was authorized to build its line of railroad, these legislators were building

better than they knew, but the present age is proving the wisdom of their course ; and in giving to this and other companies the power to provide for the present and for the greater future, they were but looking forward to a destiny which we feel sure awaits the people of this State.    While double tracks from the eastern to the western terminus of the defendant railroad company may not have been in actual contemplation at the time the charter was granted, there exist many circumstances which tend strongly to show that the legislature had in mind the possibility that even more would be necessary to furnish a way for railroad trains to convey the products of the great West through the Georgia hills and over the plains eastward and southward to the sea.    They provided for a lease by the company of its railroad or of " any one of its railroads," and an examination of the common history of the great trunk lines projected at the time will show purchases of rights of way averaging more than one hundred feet in width from terminus to terminus.

As to the right to condemn for yard purposes, the best authorities are to the effect that under a general power to construct and maintain a public improvement, all the necessary appurtenances are included.    "Authority to construct a railroad, with its necessary appendages and the buildings convenient and necessary, is sufficient to justify condemnation for engine-houses, depots, repair-shops, tanks, sheds for storing cars not in use, paint-shops, lumber and timber sheds, buildings for convenient receipt and delivery of freight, space on which to pile lumber and material to be used on or transported over the road, terminal facilities including track to reach stock-yards of company, to reach elevators and river front; and for wood and coal yards. . . . The power to construct a railroad includes the power to use land' condemned for necessary side-tracks and turn-outs."    Mills, Em. Dom. § 59.

4. Another contention of counsel for the plaintiffs in error is that the power to condemn, conferred by the acts of 1833 and 1836, was exhausted by its exercise when the road was first built; and in support of this contention we have been cited to many authorities which seem to sustain the position taken.    The cases cited against this contention are also numerous, and on both sides the authorities are eminently reputable.    It may be said in passing, however, that circumstances and the exigencies of the communities,

involved seem to have figured to a considerable extent in the con-
clusions reached by the various courts on this question.   In those
States which have grown rapidly and whose needs were such as
could only with great foresight have been provided for, it has gen-
erally been held that the power to condemn is not exhausted by a
single exercise, while in the older and more finished communities
the courts have more frequently held to the contrary.  In the first
class of cases may be mentioned those decided by the courts of
Illinois, Indiana, Kansas, Mississippi, Missouri, Nebraska, Mary-
land, Nevada, Ohio, Pennsylvania, New Jersey, and South Caro-
lina, while among the latter are the decisions of the courts of Con-
necticut, Maine, Massachusetts, and other Eastern States.   "The
power to condemn land is not exhausted by a single exercise.
Thus, in the case of railroads, it is not necessary that the company
acquire all the land that will ever be needed for the road at the
beginning of the undertaking.   It may take more land for the
expansion of its system as increased business may require."   10
Am. & Eng. Enc. L. (2d ed.) 1060.   The same authority states
that the cases which hold that the power to condemn is exhausted
after the first exercise are generally those in which the time within
which land could be condemned was limited by statute, or where
the nature of the work was not such as to necessitate a second
taking.   Unquestionably, if the time allowed the company within
which it could exercise the power to condemn had expired, the land-
owner could prevent the condemnation; but it is equally clear that
the question of the necessity of the taking is one for the legislature,
and not for the courts; and if in a given case it is plain that for
designated purposes the power to condemn was granted, the neces-
sity for its exercise would rest largely in the discretion of the
grantee.   *Savannah R. Co.* v. *Postal Telegraph Co.* 115 *Ga.* 554.
Certainly this is true as to what and how much land shall be
taken; and as a rule the courts have held that in the absence of
bad faith on the part of the grantee, this exercise of discretion will
not be interfered with.   Deitrich *v.* Lincoln R. Co., 13 Neb. 361. In
the case at bar it appears that at the time the railroad was built the
company acquired by purchase a strip of land only seventeen feet
wide, but that at the time it thought that it owned a strip sixty-six
feet wide north from the center of its track; and in its answer to
the plaintiff's declaration it set out that in locating its original track,

and in constructing at this point a single track only, it did not limit, or intend to limit, the land occupied or to be occupied by it in its legitimate business of a railroad, to the land then taken.    It was argued that if it should be held that, after electing to take at this point a strip of land only seventeen feet wide, the company could afterwards acquire at the same point an additional one hundred feet, there would be nothing to prevent it from condemning, in the future, for any number of tracks.    We think the conclusion reached is correct, and that in all cases where the right to condemn is limited only by the necessities of the railroad company, the exercise of that right may be repeated as often as the necessity arises.    Railroads generally build through new and undeveloped sections, and as their business grows and the country through which they pass becomes more densely populated, additional facilities for the performance of their duties to the public are imperative.    Larger and more roomy passenger depots are needed; more yard room for handling cars; larger turnouts and more switches.    A passenger station that was elegant and commodious and served all the needs of the city of Atlanta in 1870 is regarded as an eyesore and an unsightly "shack" in 1903. A legislature to whose progressiveness and far-sighted wisdom we have already alluded could not have intended to require this defendant to pay from its limited revenues in 1836 for land that would not be needed by it until 1902.    It would be difficult, if not impossible, for a railroad company to tell, at the begining of its existence, what amount of land would be necessary at a given point on its line for the future performance of its public duties.    See Fisher *v.* Chicago R. Co., 104 Ills. 323.    What was necessary for yard purposes for the Georgia Railroad Company in the city of Augusta in 1836 could not be a tithe of its needs in 1902.

If it should be held that a general power to condemn is exhausted in its first exercise, every railroad company, if financially able so to do, would be likely, in order to provide for the future, to take more land than it needed, and this would have a tendency to work a greater hardship upon property-owners than if only so much land was taken as would meet the needs of the railroad company, with the right to make additional condemnations to meet subsequent necessities.    As has already been said, it would be well-nigh impossible for a railroad company to determine, at its inception, how much land it would need at the end of a successful career of say twenty years; but even if

that could be done with precision, and it were financially able to acquire the land, to require it to condemn land in advance of its needs would be oppressive and subversive of its rights.

The case of Toledo R. Co. *v.* Daniels, 16 Ohio St. 390, is, in its facts, closely akin to the case at bar.    There it appeared that the company had already constructed and had in operation a line from the State of Indiana to the city of Toledo, which was the eastern terminus of the road ; that the company had erected its freight-houses and depots at this terminus, and that for the purpose of reaching these various depots and houses with its cars it was necessary to build other tracks and switches on the land sought to be appropriated.    It was objected that, the company having already once exercised the power to appropriate the private property of individuals for that purpose, its power of appropriation for the same purpose was exhausted. The court held that a general power authorizing a railroad company to appropriate private property for its own use was not exhausted by its use one time, but that it might be exercised as often as the exigency arose which required it.    " The power to make ' necessary sidetracks,' prima facie, is the power to make them when they are necessary.    Otherwise it would be the power to make unnecessary sidetracks.    Prima facie, power to do any act is power to do it in such manner and at such time as is usual, convenient, and reasonable." We have no doubt that it was the intention of the General Assembly, in chartering the defendant company in the present case, to give it the power to take private property whenever and wherever it should be necessary to carry out the purpose of its creation,    If the citizen could not, in the first instance, prevent the taking of his land for the building of the railroad, what reason is there now to allow him to check its improvement and increased ability to serve the public ?' See, in this connection, the very able opinion of Caton, J., in the case of Chicago R. Co.*v.* Wilson, 17 Ill. 127 ; Mississippi R. Co. *v.* Devaney, 42 Miss. 555, citing Railway ex parte, 2 Rich. (S. C.) 434, and Railway Co. *v.* Blake, 9 Rich. (S. C.) 229.    In the first of the South Carolina cases cited, Chief Justice Richardson said : " The railroad company had the same power to acquire land, either by grant or by compulsory proceedings, for the purpose of varying, altering, and repairing their road, as for the original purpose of locating and constructing it."    In the Mississippi case cited supra, many of the cases cited by the text-writers as sustaining the position contended for by

the plaintiff in error in the present case are considered and reviewed, and the conclusion is reached that the right to purchase and to condemn land for the purpose of enlarging depots, building side-tracks, and extending yards, whenever necessary to the discharge of the company's duties to the public, results from the right given in the first instance to establish and maintain a railroad. In Stamps *v.* Birmingham R. Co., 22 Eng. Ch. R. 677, the Lord Chancellor, in construing an act of the same character as the one now under discussion, said that in his opinion nothing would be more inconvenient than to hold that when the company had once taken a quantity of land such as they then thought necessary, they could not afterwards, if it was found that the land taken was insufficient for the purposes allowed, come for more, and added: "A thousand unforeseen circumstances may occur in the progress of their works, which may make it necessary for them to have more land than they originally calculated on." See also Lewis, Em. Dom. § 259; Simpson *v.* Lancaster R. Co., 38 E. C. R. 579; Philadelphia R. Co. *v.* Williams, 54 Pa. 103; Prather *v.* Jeffersonville R. Co., 52 Ind. 16; Peck *v.* Louisville R. Co., 101 Ind. 366; Fisher *v.* Chicago R. Co., 104 Ill. 323; Chicago R. Co. *v.* Illinois R. Co., 113 Ill. 156; Central Branch R. Co. *v.* Atchison R. Co., 26 Kans. 669; Deitrichs *v.* Lincoln R. Co., 13 Neb. 361.

5. In all the cases which we have cited so far we have not considered any decided by this court; and although our attention has been called to the cases of *Alabama R. Co.* v. *Gilbert,* 71 *Ga.* 591, and *Savannah R. Co.* v. *Woodruff,* 86 *Ga.* 94, we have, after a careful consideration of those two cases, come to the conclusion that there is nothing in either of them contrary to what is here laid down that is binding upon us as precedent, and that the question discussed in this portion of our opinion is an open one in this State. In the *Gilbert* case, it is true, Chief Justice Jackson in his opinion asserts that " the authorities are to the effect that what a corporation first condemns, or buys, or takes as necessary for its franchise, it will be bound by as its election; and the chartered rights will be thereby exhausted, so far as the then existing charter vests it with power." As sustaining this position, the learned Chief Justice cites Mills, Em. Dom. § 58; 35 Barb. 373; 9 Paige, 323; 10 Bush, 529; 17 Ohio, 340; 30 Me. 498, and 31 N. J. L. 205. The section cited from Mills on Eminent Domain contains much more

argument in favor of the position now taken by the writer than to the contrary, as will be seen by reference to the citations hereinbefore made. The case from 9 Paige is authority only for the proposition that " where the charter of a railroad company requires the whole line of the road to be surveyed and located, and the certificate of location to be filed in the clerk's office, before the commencement of the work, the corporation is not authorized to change the route of its road after it has been once located, and a certificate of such location made and filed." In the case of Morris R. Co. *v.* Central R. Co., 31 N. J. L. 205, it was only held that, the road seeking to condemn having been long completed and in use, and the branch then proposed to be made having formed no part of the original plan in making the road, the defendant company had no right to add such branch under any provision of its charter; and the judge pronouncing the opinion in that case said that he thought that " the defendants, by laying out their road, with its appendages, to their own satisfaction, in the sense in which they understood their charter, entirely exhausted all the powers conferred upon them to take land under their charter."

A careful reading of the opinion in the case of *Alabama R. Co.* v. *Gilbert* discloses that the language which we have quoted from it is plainly obiter. It appeared that the charter of the Alabama Great Southern Railroad Company empowered it to condemn for a right of way a certain number of feet in width of road-bed, provided it did not interfere with any building. The company did not condemn any of the land of a landowner on its line, but constructed its road through his land, and used the road-bed only. He built a house upon that part of his land near the track, but which was not, at the time of building, occupied by the company, and remained in the peaceable and adverse possession of it continuously for about nine years, when proceedings were taken by the company to condemn the land to the full extent of its charter power, including that built on. The court held that this could not be done, because of the fact that it was provided in the charter that lands on which buildings of any sort had been erected could not be condemned on any terms whatever against the will of the owner; and it appearing that the company had simply taken possession of a sufficient strip of land to lay its road upon, and had not sought to condemn the amount allowed them on either side thereof, and the landowner

having built a house upon his land, which he had occupied for nine years, it was held that the railroad company could not, after having allowed the property to remain uncondemned and the house to be occupied without interruption for so long a time, come in and take the land by condemnation.    The Chief Justice, in his opinion, said that the landowner "had the right to reason and believe that the company had all it wished for the exercise of its franchise, and to act upon such reason and belief, and build upon his own land not embraced within what the company had elected, by its own conduct, as sufficient for its use under its charter. . . If the building had been where it is, when the road was constructed, the land could not have been condemned.    The corporation slept over its rights until the property increased in value and changed its character by being built upon, and now seeks to do what it could not have done had it been so valuable and improved then."    In that case the right to condemn land on each side of the road-bed at the time the road was constructed was a privilege which the company might have exercised or not, and when it failed to exercise such right, and the landowner built a house upon land which they might have condemned but did not condemn, the right of condemnation as to that land was lost.    No such state of facts exists in the case at bar, and the statement in the opinion of the Chief Justice which is in conflict with what is here laid down is obiter and not binding upon us.    There is nothing in the case of *Savannah R. Co.* v. *Woodruff*, 86 *Ga.* 94, that in any manner stands in the way of what is now ruled.

The foregoing disposes of every question made by the bill of exceptions.    In dealing with each we have become greatly indebted to counsel on both sides of the case for the valuable aid rendered us in their exhaustive briefs and for the able presentation of their respective contentions before this court.    We have carefully considered all the authorities cited by both sides, as well as many others bearing upon the subject which were not cited in the briefs furnished us.    The importance of the questions involved has seemed to us to warrant a very full discussion.    We have not lost sight of the well-established principle of law, in dealing with this charter, that statutes made in favor of corporations and particular persons, in derogation of common right, are to be strictly construed, and that care should be taken not to extend them beyond their express

words or their necessary import.　We believe that the construction here given the charter of the defendant company is entirely in accord with that rule.

*Judgment affirmed.　By four Justices.　Lamar J., disqualified.*