## MARSHALL *et al. v.* COUNTY OF FLOYD *et al.*

1. Under the provisions of section 6 of the act approved August 15, 1914 (Acts 1914, p. 271), relating to the jurisdiction of the authorities of Floyd county over certain bridges within the City of Rome, the work of tearing down the old bridges and the erection of new bridges in their place could not be begun until the suit for injunction brought to contest the validity of a part of the act was determined.

2. While the advertisement itself did not show in detail all the plans and specifications and the terms and time of payment, reference was made in the advertisement to such details, specifications, plans, and terms, which could be seen and examined by the public and by bidders in a specified depository; and under the facts of this case this was sufficient.

3. The contracts as finally let for two of the bridges were based upon plans and specifications known as alternate designs or plans, which differed materially from the plans and specifications referred to in the advertisement upon which the competitive bidding was had, and consequently the contracts awarded upon these alternate plans were void.

4. Under the facts appearing in the record, the plaintiffs were not guilty of such laches as to bar them of the remedy sought in a court of equity.

APRIL 14, 1916. REHEARING DENIED MAY 17, 1916.

Petition for injunction. Before Judge Wright. Floyd superior court. July 14, 1915.

W. A. Marshall and others, for themselves and those similarly situated, alleging themselves to be residents and taxpayers of Floyd county, brought their equitable petition against the County of Floyd, the Board of Commissioners of Roads and Revenues of the county, the Hackedorm Contracting Company and the Hardaway Contracting Company, alleging in brief, as follows: Under the provisions of the act approved August 15, 1914 (Acts 1914, p. 271), which is an act relating to the control of three certain bridges within the City of Rome, the jurisdiction of the bridges referred to was vested in the County of Floyd, and they are under

the control of the commissioners of roads and revenues of the county. The board employed engineers who made plans and specifications for the building of the bridges under the terms of the act, and these engineers submitted to the county authorities plans and specifications, and estimated the cost to be about $260,000 for the three bridges. The board of commissioners let the contracts for the building of the bridges after advertisement, and numerous bids were received. The contract for building two of the bridges, known as Broad Street bridge and Second Avenue bridge, had been awarded to the Hackedorm Contracting Company for the sum of $123,000; and the contract for building the Fifth Avenue bridge for the sum of $87,000 was awarded to the Hardaway Contracting Company. Under the terms of the act of August 15, 1914, above referred to, the Rome Railway & Light Company filed in the United States court its bill in equity against the County of Floyd, seeking an injunction against assessing it a part of the cost of the construction of the bridges; and the litigation thus commenced has not terminated; but nevertheless the County of Floyd and the board of commissioners and the contractors named are threatening to proceed with the work of tearing down the old bridges and the building of the new ones before the suit of the Rome Railway & Light Company is finally disposed of; and the county authorities have levied a special tax, estimated to produce $225,000, for the building of the bridges. The advertisement of the letting of the contracts was insufficient in law, and did not authorize the letting of the contracts, and did not give sufficient notice of the terms and times of payment and of the time when the work would begin and when it would be completed. All the bids or proposals received for the work on the basis of the plans and specifications set out and described in the advertisement were rejected; and other proposals, involving material changes in the plans and specifications, substantially varying the character and materially affecting the cost of the bridges, were accepted; and contracts were made for the building of the bridges under such new plans and specifications, without notice or advertisement and without competitive bidding on the work according to the plans finally adopted. Petitioners pray for injunction against the defendants, restraining them from carrying out the alleged illegal contracts, and for other relief.

8

The defendants filed demurrers to the petition, and answered. They denied that the letting of the contracts for the building of the bridges was illegal; and contended that the work which the commissioners were proceeding to do could have been legally done without the authority of the act of August 15, 1914. They denied specifically that there had been material changes and alterations in the plans and specifications of the bridges as advertised, and set up other matters (which are referred to in the opinion) to show that the acts on the part of the county authorities and the companies to which the contracts were awarded were not illegal. At the interlocutory hearing, after the submission of evidence, the court refused the injunction.

*Barry Wright,* for plaintiffs.

*M. B. Eubanks, J. Branham, Maddox & Doyal, W. B. Mebane,* and *Denny & Wright,* for defendants.

BECK, J. (After stating the foregoing facts.)

1. We are of the opinion that the court erred in refusing the injunction. In the first place, we do not think that the county authorities and the contractors could proceed with this work until the suit brought by the Rome Railway & Light Company in the United States court had been disposed of. The title of the act approved August 15, 1914, and referred to in the statement of facts, is as follows: "An act to vest in Floyd County full and complete title, jurisdiction over, and control of the following bridges within the City of Rome in Floyd County, Georgia, to wit: Second Avenue Bridge spanning the Etowah River, Broad Street Bridge spanning the Etowah River, and Fifth Avenue Bridge spanning the Oostanaula River; to revoke any and all permits granted by the legislative or municipal or county authority to any street-railway company, electric-light, telegraph, telephone, or gas company to lay tracks and operate cars on and over said bridges, or to place wires or pipes and operate the same on and over said bridges; to repeal all franchises heretofore granted to all such public-service corporations to operate on and over said bridges, whether granted by legislative, county, or municipal authority upon condition; to authorize the county authorities of Floyd County to condemn and remove the present bridges and to build new bridges at the same points, and to authorize the county to acquire the necessary lands for the purpose of constructing bridges wide

enough to meet the demands of public travel; to authorize said county to require of any street-railway company or electric-railway company desiring to lay the tracks on and operate its cars over said bridges, or either of them, to pay to said county a sum equal to one third of the actual cost of building either of said bridges before any such company shall be allowed to lay any tracks, place any wires or other equipment, or operate any cars on or over such bridge or bridges, and to fix the rights of such corporation by reason of such payments; to grant to the county authorities of Floyd County the exclusive right and jurisdiction to grant permission and franchises to persons, firms, and corporations exercising public-service functions, to operate on or over said bridges, and to prescribe the terms and limitations of such grants; to provide that any person, firm, or corporation desiring to contest the validity of this act shall do so by injunction proceedings before the beginning of the work of tearing down and removing the old bridges, and not otherwise; to provide for the acceptance of this act by the county and city authorities, and for other purposes." Section 1 of the act vests in Floyd County complete jurisdiction and control over the three bridges. Section 2 revokes all permits and franchises previously granted to street-railway or electric-railway companies, or other public utility corporations, to use or occupy the bridges or any part thereof, unless the companies shall conform to the terms and conditions required by the county authorities. Section 3 authorizes the county to condemn and remove the present bridges, to build new bridges on the same sites, and to require public-utility corporations to remove all their equipment from the bridges. Section 5 defines the interest acquired by such public-service corporations in the use and occupation of the bridges. Sections 7 and 8 contain provisions as to making effective the terms of .the act. Section 9 contains the repealing clause. Section 4 reads as follows: "Be it further enacted, that the county authorities of said county are hereby given the exclusive right and jurisdiction to grant permission and franchises to persons, firms, and corporations, exercising public-service functions, to operate on and over said bridges, and to place railway tracks thereon, and to operate cars on and over said bridges, and to prescribe the terms and limitations of such grants; and the county authorities of said county are authorized to require of

any street-railway company or electric-railway company, as a condition precedent to the laying of tracks, placing of wires, and operating cars on and over said bridges, that it pay to said county a sum equal to one third of the actual cost of the building of said bridges, and the sum shall be paid to the treasurer of said county before any such company shall be allowed to lay any tracks, to place any wires or other equipment, or operate any cars on and over such bridges; but any corporation now having a franchise shall have the right to use any new bridge upon complying with the reasonable conditions imposed by the board of commissioners and the terms of this act." Section 6 reads as follows: "Be it further enacted, that any person, firm, or corporation desiring to contest the validity of any part of this act shall do so by injunction proceeding before the beginning of the work of tearing down and removing of such bridges, and not otherwise. Notice shall be given all persons, firms, and corporations of the time when work is to begin, by publishing a notice thereof by the chairman of the board of commissioners in the newspapers in which sheriff sales are advertised. Said notice shall state the time when the work is to commence, as near as practicable, and the estimate of the cost of each bridge. Said notice shall be published once a week for two weeks, the last publication to be at least thirty days before work is to begin. Any person, firm, or corporation desiring to object to any terms of this bill, or to any charge that may be made thereunder, or the levy of any tax or any assessment or charges for building the bridge or bridges, shall file an injunction at least twenty days before the date the work is advertised to begin, against the county, stating the objections to the bill; which shall be heard as other injunctions are heard. And the work shall not begin until said injunction suit is finally determined."

Under the provisions of section 6, the Rome Railway & Light Company filed in the district court of the United States its equitable petition for injunction; and that petition has not yet been disposed of. The last clause of section 6 of the act of 1914 makes it mandatory that "the work shall not begin until said injunction suit is finally determined." In section 4 of the act the county authorities of Floyd county were authorized to require of any street-railway company or electric-railway company, as a condition precedent to laying its tracks, placing wires, or operating cars

on said bridge, that it pay to the county a sum equal to one third of the cost of building the bridge. It was evidently the legislative intent that the question of liability of a street-railway company contemplating the use of the bridges for a part of the cost of construction should be settled before the work was commenced. A street-railway company contemplating the use of the bridge is referred to specially; because, while any corporation desiring to contest the validity of the act by proceedings for injunction was required to do so before beginning the work of tearing down and removing the bridges, the question of the liability of a street-railway company which intended to use the bridges must have been paramount in the legislative mind, because the county authorities were empowered to exact of such a company, before it could place its equipment on the bridge, that it pay a sum equal to one third of the cost of the building. And this liability of a street-railway company for the use of the bridge could certainly have been urged as a strong inducement to the voters to cast a ballot "for bridge act" in the election, when the question of adopting or rejecting that act was before the people, it having been left to the people to say whether the terms of the act should go into effect.

The defendants insist that the provision in section 6 of the act, to the effect that work shall not begin until the injunction suit is finally determined, is unconstitutional and void; that the board of commissioners of Floyd county, under the general laws of the State, have the power and authority, under the circumstances shown in the petition, to construct the bridges at such time as they may deem best; that the provision in the special law is violative of the provisions of art. 1, sec. 4, par. 1, of the constitution of this State, which provides that no special law shall be enacted in any case for which provision has been made by an existing general law; and that under the existing general law the county authorities could let the contracts and have the work done which they are now seeking to do. We differ with counsel for defendants who urge this contention. We are of the opinion that the county authorities are proceeding under the provisions of and by virtue of the authority vested in them by the special act of 1914. It may be that the streets and bridges of a city are a part of the highways of a county, and that to a certain extent the county authorities may exercise jurisdiction and control over them; but we do

not know of any general law which authorizes county authorities to go into a city and condemn and tear down its bridges or tear up its sidewalks and replace them with other costly structures and expensive pavements, without the consent of the municipal authorities of the city affected by such acts upon the part of the county authorities. The county authorities of Floyd county are claiming the right to exercise complete, absolute, and exclusive jurisdiction over these bridges and their approaches in the City of Rome, and the right to tear down the old bridges existing at the time of the passage of this special act, and to replace them with costly structures. If they have the right to do that, they must find it in special acts; for it is not conferred upon them by any existing general law. Counsel for the County of Floyd cites the case of *Board of Commissioners* v. *Americus,* 141 *Ga.* 542 (81 S. E. 435), in support of their position that under the general law the county authorities could carry out the work which they propose as to the destruction of the old bridges and the erection of these three new bridges. But we call attention to the latter portion of the decision in that case, in which this court said: "It was further argued, however, that the streets of the City of Americus were a part of the county roads or of the public works of the county, and that the county commissioners could be required to keep in repair this branch of their roads. In 1 Elliott on Roads and Streets (3d ed.), § 503, it is said: 'It is obvious that the officers having control of county affairs can not justly be permitted to control the streets of a city; and for this conclusion there are at least two satisfactory reasons. It would violate the principle of local self-government to permit officers elected to govern one corporation to control the public ways within another and distinct corporation, for the officers of one corporation can not be considered the representatives of another and different corporation. It is not the officers who constitute a public corporation, nor the frame of its government, but the people of the locality. The legislature may provide a frame or form of government, but it can not in the true sense create a town or city, because towns and cities are composed of the inhabitants who dwell in a designated territory.' Blocker *v.* State, 72 Miss. 720 (18 So. 388), and cases cited. It is not necessary to discuss how far the legislature may deal with the streets of a municipality; but we quote the above authority as

showing that, ordinarily, county roads and municipal streets are not treated as the same; and when provision is made for one, it is not usually construed as including the other. See also *Almand* v. *Atlanta Con. St. Ry. Co.,* 108 *Ga.* 417 (34 S. E. 6); *Commissioners of Polk County* v. *Cedartown,* 110 *Ga.* 824 (36 S. E. 50). The case of *Daniels* v. *Mayor etc. of Athens,* 54 *Ga.* 79 (s. c. 55 *Ga.* 609), involved peculiar facts where a county and municipality had certain agreements in regard to a bridge erected across a stream by the county, and over which jurisdiction was retained. Without discussing the soundness of the reasoning in that case, it has been differentiated, on account of its peculiar facts, in *Commissioners of Polk County* v. *Cedartown,* supra." In the *Polk County* case it was said: "When the corporate limits of a city are so extended as to embrace therein a portion of a public highway and a bridge over a stream crossing the same, the municipal authorities at once acquire the right to exercise jurisdiction over the bridge, and are chargeable with the duty of keeping it in repair after the county authorities have expressly relinquished such jurisdiction, which they may do with or without the assent of the municipal authorities." And in the case of *Almand* v. *Atlanta Con. St. Ry. Co.,* supra, it was held: "The general rule is that when a municipal corporation is created it becomes vested with jurisdiction over the territory embraced within its corporate limits, and the mere fact that there has been a valuable improvement made by the county authorities on one of the streets of an incorporated city does not oust the municipality of its jurisdiction over such street. The above is true notwithstanding the street improved was, before the incorporation of the city, a part of an established public road of the county."

We make these excerpts from the authorities referred to, to show that where county authorities seek to tear down bridges constituting a part of the streets of a city, and where there is a special act of the legislature conferring upon them the power to thus tear down and destroy existing bridges and to interfere with the highway in the municipality existing at that time, the power upon the part of the county authorities to do these things is referable to the special act, and not to the general law limiting and defining the jurisdiction and powers of boards of county commissioners. And applying that ruling to this case, we hold that the authority

for the acts of the county authorities of Floyd county with reference to the three bridges in question, and the letting of the contracts for the building of new bridges in place of those which they propose to destroy, is to. be found under the act of 1914; and if that act is wiped out, the county is without authority to destroy the old bridges and build these three new bridges as proposed. Counsel for the county say that section 6 of the act is unconstitutional, that being the section which requires that the suit for injunction filed by the electric-railway company shall be determined before work is commenced. While in some cases it may be held that some particular clause or section of an act is unconstitutional and void, without impairing the validity of the remainder of the act, it can not be done in this case. Clearly it can not be said that the provisions of section 6 of the act under consideration can be destroyed and the remainder of the act held to be of force; for it can not be said that section 6 is not an essential part of the entire legislative scheme of the act of 1914, and therefore separable from it. For, as we have pointed out above, in providing for the building of these bridges and conferring upon the county authorities the right to go ahead and destroy the old bridges and build these new ones, the legislature had in mind, no doubt, that the street-railway company would be compelled to use the bridges, and therefore to pay a substantial part of the cost of construction. When we say compelled to use the bridges, we do not mean that by the terms of the act they were forced to use them, but we mean compelled by the circumstances of the case. The elaboration of the title to this act and of section 4 shows that assessment of public-utility corporations using the bridges was an essential part of the act; and evidently the legislature considered it of great importance to have any litigation contesting the validity of those provisions settled in advance. The county authorities are proceeding under this act, and, with section 6 thereof stricken out as unconstitutional, the basis of their power and authority to carry on the proposed work is gone; for the act is destroyed if section 6 is held to be invalid. With section 6 in, they are without legal authority to commence the work until the suit of the Rome Railway & Light Company, before referred to, is determined. So in either case they should have been enjoined from proceeding with the work while that suit was pending.

2. The advertisement of the letting of the contracts for the building of the bridges was attacked upon the ground, among others, that the advertisement, a copy of which was attached to the petition, was insufficient in law, and did not and does not authorize the letting of the contracts for the building of said bridges, and did not and does not give sufficient notice of the terms and time of payment, and of the time when said work should begin and the approximate time when it would be completed. In view of the plans and specifications, the forms of the contracts, proposals, and bonds, and instructions to bidders, referred to in the advertisement, which were in the office of the county engineer at Rome, Georgia, where they could be seen by bidders and by the public, as shown by the advertisement, we are of the opinion that the questions made by the objections to the sufficiency of the advertisement are controlled adversely to the plaintiffs in error by the decisions of this court cited under sections 387 and 388 of Park's Code, and especially the case of *Pilcher* v. *English,* 133 *Ga.* 496 (66 S. E. 163).

3. The plaintiffs complain, as to the Broad Street bridge and Second Avenue bridge, that the evidence showed that after all the bids were received under the advertisement and in accord with the plans and specifications referred to in the advertisement, the board of commissioners of roads and revenues, instead of letting the contracts for these two bridges upon one of these bids, entered into and signed contracts for the building of these two bridges on plans and specifications materially different from the plans and specifications upon which bidding was had, and which plans and specifications were referred to in the advertisement and notice given. It is complained that the new plans, or alternate plans as they are called, were not submitted in any manner for competitive bidding, and that no competitors of the parties to whom the contracts were awarded had an opportunity of bidding on them at all, and that in the alternate plans, with reference to which the contracts were finally signed, the character of the work, the material to be used, and the character of the structures were materially changed. We are of the opinion that as to these two bridges, the Broad Street bridge and Second Avenue bridge, this complaint is well founded, and that the evidence in the case, which we will not attempt to set out, shows a substantial and material change from the plans

and specifications upon which competitive bidding was had; and the changes were so material that we can not say that the bridges for which the contracts were awarded were the same as those which would have been erected had the contract let by competitive bidding been carried out in all material particulars. The defendants deny that the contracts as finally awarded differ from the contracts upon which the competitive bids were submitted. They point out, that in advertising for bids it was distinctly stated that bidders might submit alternate designs in lieu of the original designs, with bids thereon, and the right was reserved to the county to reject any and all bids and any and all designs; that the Hackedorm Contracting Company, the successful bidder, submitted a design known as "Design B," for the construction of the Second Avenue and Broad Street bridges according to the specifications of the county engineer; and that its bid on this "Design B," in accordance with the specifications of the county engineer, was accepted and the contract awarded to it as the lowest and best bidder for the construction of each of said bridges. They show further, that the roadways in the Second Avenue and Broad Street bridges were reduced from forty to thirty-six feet, in order to make the bridges conform to the streets leading from the bridges, but that in doing so the cost of the bridges as let was not affected; that the bids on each and all of the bridges were based upon unit prices, and the county commissioners, in the specifications, reserved the right to take from the plans any unit or number of units that they so desired, without affecting the contract prices of the remaining units—the number taken off to be deducted from the total number of units in the bridge, as will be observed by an inspection of the contracts made with the contractors, etc.; that each separate item of the work was bid upon separately at so much per yard, as, for instance, concrete in the piers at so much per yard, concrete in the superstructure at so much per yard, and the elimination of any number of yards of concrete or any number of pounds of reinforcing material could not affect the remainder of the work in any particular; and that each and all of the bidders submitting bids upon the work were furnished with said specifications in advance of the submitting of their bids, and knew of the county's right to reduce or take from said work any number of units. But when we examine the evidence, we find that the alternate plans

and specifications upon which the contracts as let were based were not among the plans and specifications contained in the depository referred to in the advertisement. There was a provision, it is true, as contended by the defendants, that the number of units could be reduced; but not only was the number of units reduced, but there was a material change in the style of the structure made when the alternate plans were submitted and adopted, and no one can tell what would have been other competitive bids if these plans which were finally adopted had, with the necessary specifications and details, been published in the advertisement or been placed in the depository referred to, so that all the competitors could have examined them and based their bids thereon.

It has been very earnestly urged in the argument of counsel for defendants in error, that it would be very unfortunate, if not disastrous, for the county for these contracts to be declared illegal; that the building of these bridges involves a very large sum; and that the contracts which the county authorities have were made upon terms more advantageous to the county than can again be secured. And it is no doubt true that under the circumstances the bridges should be built at as early a date as possible. But we can not for such reasons ignore the plain provisions of the statute in regard to the letting of contracts for public works. We can not make exceptions not contemplated by the statute. Where the strict mandate of the statute applies, this court is forced to apply it; and therefore we are forced to hold that the court erred in refusing to enjoin the carrying out of these contracts.

4. Under the facts appearing in the record, the plaintiffs were not guilty of such laches as to bar them of the remedy sought in a court of equity. *Judgment reversed. All the Justices concur.*