## HOWARD *et al.* *v.* CITY OF ATLANTA.

No. 13274.   July 16, 1940.   Rehearing denied July 29, 1940.

*George P. Whitman* and *Shelton, Pharr & Long,* for plaintiffs.

*J. C. Savage, C. S. Winn, J. C. Murphy, E. L. Sterne,* and *F. A. Hooper,* for defendant.

Reid, Chief Justice.   ■   We are called upon by the present record to determine whether the City of Atlanta in expanding an airport which it now owns and operates has the authority to condemn property situated beyond its geographical limits and within the limits of the City of College Park.   The City of Atlanta served condemnation notices on the owners of certain property situated as above indicated, and they jointly sought an injunction.   The judge sustained a general demurrer to the petition, and the plaintiffs excepted.   In the uniform airports act of 1933, section 1 (Ga. L. 1933, p. 102; Code, § 11-201), "Municipalities, counties, and other political subdivisions of the State" were given authority "separately or jointly, to acquire, establish, construct, expand, own, lease, control, equip, improve, maintain, operate, regulate and police airports and landing fields for the use of aircraft either within or without the geographical limits of such municipalities, counties, and other political subdivisions," with the right to use "for such purpose or purposes any available property that is now or may at anytime hereafter be owned or controlled by such municipalities, counties, or other political subdivisions."   Section 3 of the act (Code, § 11-203) provided that "Private property needed by a county, municipality, or other political subdivision for an airport or landing field or for the expansion of an airport or landing field may be acquired by grant, purchase, lease, or other means, if such political subdivision is able to agree with the owners of said property on the terms of such acquisition, and otherwise by condemnation in the manner provided by the law under which such political

subdivision is authorized to acquire real property for public purposes."·

The first point made by counsel for the plaintiffs is that the act does not in fact confer upon municipalities any right to condemn property outside of their territorial limits. This argument is bottomed on the fact that section one of the act which gives municipalities power and authority "without the geographical limits of such municipalities" refers merely to ownership, operation, etc., of airports and landing fields, and that section 3 which confers the power of condemnation does not contain this broad language. The right of a municipality to own property for a particular·purpose, given by express statute, does not authorize the municipality to condemn property for such purpose. See *Markham* v. *Howell*, 33 *Ga*. 508; *Georgia Railroad & Banking Co.* v. *Union Point*, 119 *Ga*. 809 (47 S. E. 183). Accordingly, it is clear that section 1 of the act, standing alone, does not vest in the various municipalities the right to condemn land for airports either within or without the territorial limits of such municipalities. Section 3 deals with condemnation, and provides in substance that municipalities may condemn property needed by them "·for an airport or landing field or for the expansion of an airport or landing field." Two principles ·are suggested as requiring a decision that this section does not confer authority on a municipality to condemn land for the purpose specified without its territorial limits. The first is that, as a general rule, a municipal corporation can not, without express or implied authority granted in its charter, exercise its corporate powers beyond the limits of the municipal boundaries. *Loyd* v. *Columbus*, 90 *Ga*. 20 (15 S. E. 818) ; *Langley* v. *Augusta*, 118 *Ga*. 590 (1-3) (45 S. E. 486, 98 Am. St. R. 132) ; *Hall* v. *Calhoun*, 140 *Ga*. 611 (79 S. E. 533) ; *City of Quitman* v. *Jelks*, 139 *Ga*. 238 (1-3) (77 S. E. 76) ; *City Council of Augusta* v. *Owens*, 111 *Ga*. 464 (6) (36 S. E. 830) ; *Town of Mansfield* v. *Cofer*, 145 *Ga*. 459 (89 S. E. 410) ; *Mayor &c. of Gainesville* v. *Dunlap*, 147 *Ga*. 344 (2) (94 S. E. 247) ; *Mayor &c. of Montezuma* v. *Law*, 1 *Ga. App.* 579 (57 S. E. 1025) ; *Newton* v. *Moultrie*, 39 *Ga. App.* 702 (148 S. E. 299). The other is that statutes conferring the power of eminent domain must be given a strict construction, "and when the power is granted, the extent to which it may be exercised is limited to the express terms or clear implication of the statute in which the

grant is contained." 18 Am. Jur. 650, § 26; *Chestatee Pyrites Co.* v. *Cavenders Creek Gold Mining Co.*, 119 *Ga.* 354, 356 (46 S. E. 422, 100 Am. St. R. 174) ; *Hopkins* v. *Florida Central & Peninsular R. Co.*, 97 *Ga.* 107 (25 S. E. 452).

An examination of the decisions which announce the first-stated principle shows that whether or not a municipality can in fact exercise a given power beyond its territorial limits, in the absence of express language to such effect, depends at last upon the nature of the subject-matter to which the power relates, and whether a full and complete exercise of the power reasonably requires action beyond the territorial limits of the municipality. "The general doctrine that a municipal corporation can only exercise its powers within its corporate limits is founded on the fact that generally no authority is given by charter to act beyond such limits; and hence the corporate authorities are restricted in that regard by the general rule that they can exercise only such powers as are granted by express words. The general rule is, however, subject to the qualification that a municipal corporation may also do those things which are fairly or necessarily implied in or incident to the powers expressly granted." Dillon on Mun. Cor., 1627, note. Thus in *Langley* v. *Augusta*, 118 *Ga.* 590 (45 S. E. 486, 98 Am. St. R. 133), it was said that an express grant of authority to a city to construct sewers and drains should be held to include the power to construct them beyond the corporate limits, where it is found by the authorities to be reasonably necessary in order to establish a complete and useful system of sewerage. The court took cognizance that it would be impracticable and most undesirable to require a municipality to confine such works within its limits. *Loyd* v. *Columbus*, supra, which constituted a ruling to the contrary, was criticized and doubted by the court. In *Hall* v. *Calhoun*, supra, the court held that the City of Calhoun had authority under the terms of its charter to establish and construct a system of waterworks, and that under this grant it could, where necessary, obtain by contract a source of water beyond its limits. The court said that *Loyd* v. *Columbus*, supra, "will not be extended." It is a matter of common knowledge that an airport requires an extensive tract of land, and it is evident that in the majority of cases it would be most impracticable and undesirable to set aside so much land within the confines of a municipality for such purpose. From this

and other considerations that might be mentioned, it is at least not entirely clear that the grant of power to municipalities to condemn land for the purpose of establishing and expanding airports, as contained in section 3, even though strictly construed, would not *in and of itself* be sufficient authority for a municipality to con-´ demn land beyond its limits where it is reasonably necessary. Especially is this true in regard to the *expansion* of an airport owned and operated by a municipality such as the City of Atlanta beyond its territorial limits, under authority theretofore granted to it by the General Assembly. It is not necessary, however, that we go to this extent in the present case. Section 3 should not be considered disassociated from the other provisions of the act of which it is an integral part. It is elementary that all of the pro-visions of an enactment should be considered in determining the meaning of any part. *Cairo Banking Co.* v. *Ponder,* 131 *Ga.* 708 (63 S. E. 218) ; *City of Macon* v. *Georgia Power Co.,* 171 *Ga.* 40 (155 S. E. 34). In section 1 of the act the various municipalities are empowered to establish and expand, etc., airports "within or without the geographical limits of such municipalities." There can be no better evidence than this that the General Assembly recognized that it might be necessary and expedient for municipali-ties, in order to establish or expand existing airports, to go beyond their respective boundaries. Having thus recognized the probable necessity for such action, in section 3 it was provided in substance that a municipality could condemn property *needed* "for an air-port or landing field or for the expansion of an airport or landing field." Therefore it seems clear that the grant of power to con-demn in section 3 is as broad as the power to establish and expand, etc., provided for in section 1.

■ A further point made by counsel for the plaintiffs is that this grant of power to municipalities to condemn property "within and without the geographical limits of such municipalities" should not be held to authorize one municipality to condemn land within the territorial limits of another municipality. It is not disputed that the General Assembly has the power to grant such authority if it sees fit to do so. *Lee County* v. *Smithville,* 154 *Ga.* 550 (115 S. E. 107) ; *County of Floyd* v. *Rome Street Railroad Co.,* 77 *Ga.* 614 (3 S. E. 3). The phrase "within and without the geographical limits of such municipalities" is as broad as the universe, since

every point is either within or without the limits of a municipality. In its broad sense it includes territory which is within the confines of a municipality and all of that which is not so situated, including that in another municipality. The act vests in each municipality the same general authority; that is, each is given the power to condemn land within and without its boundaries; and accordingly each is by the terms of the statute vested with jurisdiction over every part of the State, including the territory within the limits of every other municipality. In the consideration of all legislative enactments, that exposition should be made which will carry out the intention of the legislature as expressed in the language used. The uniform airports act clearly indicates a recognition by the General Assembly of the great strides made in aviation and a public need for the establishment and expansion of airports and landing fields. Indeed the preamble recites that "it is essential to the progress and well-being of this State that aviation be encouraged and developed," etc. The General Assembly appointed, as agents of the State for this purpose, municipalities, counties, and other political subdivisions. In section 1 they were empowered to establish and expand, etc., airports and landing fields "within and without" their geographical limits. In section 3 they were empowered to condemn private property *needed for such purpose.* We have already construed the act as authorizing them to condemn private property "within and without" their geographical limits. It is apparent that the end sought to be attained by the General Assembly was the establishment of airports and landing fields throughout the State, and that in appointing municipalities and counties agents of the State for this purpose it expressly severed the ties that bound them to their own geographical limits. The conclusion that the General Assembly intended that every municipality and county should have full power to do all the acts reasonably necessary in order to establish or expand an airport is easily reached by even a casual reading of the act. The grant to every municipality is in effect the right to condemn property within and without its boundaries which is needed in order to establish or expand an airport, and no limitation is added that the property needed shall not be within the confines of another municipality. It is to be noted in this connection that a county is expressly authorized to condemn property in another county; for a county can not condemn

property outside of its limits without going into another county. As a general rule, the grantee of the power of eminent domain for a public purpose is generally vested with a broad discretion in determining whether the power will be exercised, and what property will be taken for the purpose. *S., F. & W. Ry. Co.* v. *Postal Telegraph Co.*, 112 *Ga.* 941 (38 S. E. 353); *Bridwell* v. *Gate City Terminal Co.*, 127 *Ga.* 520 (56 S. E. 624, 10 L. R. A. (N. S.) 909); *Town of Poulan* v. *Atlantic Coast Line R. Co.*, 123 *Ga.* 605 (51 S. E. 657); *Gardner* v. *Ga. R. &c. Co.*, 117 *Ga.* 522 (43 S. E. 863); *Thom* v. *Ga. Mfg. Co.*, 128 *Ga.* 187 (57 S. E. 75).

Accordingly we do not think that it can be said as a matter of law that one municipality can not condemn property for airport purposes within another municipality. Prima facie the power exists under the terms of the act, the only limitation being that some substantial necessity exist for taking the property situated as it is within another municipality. The latter requirement is well illustrated by the ruling in *W. & A. R. Co.* v. *W. U. Tel. Co.*, 138 *Ga.* 420 (3) (75 S. E. 471, 42 L. R. A. (N. S.) 225), to the effect that a telegraph company having the right to use the right of way of railroad companies for the erection of its poles, wires, etc. (Code, § 104-204), could not condemn a railroad company's right of way on both sides of the track, at least without making it appear that it is necessary to occupy both sides, and that the railroad company's operation of its trains will not be materially interfered with. See *Savannah River Terminals Co.* v. *Southern Ry. Co.*, 148 *Ga.* 180 (96 S. E. 257). Thus, while the act prima facie empowers one municipality to condemn land within another municipality, it does not follow that a municipality in one part of the State would have the right to establish an airport in a municipality in a distant part of the State. This would manifestly be an abuse of the power granted, which would be enjoined by the courts. See *Piedmont Cotton Mills* v. *Ga. Ry. & El. Co.*, 131 *Ga.* 129 (62 S. E. 52); *Atlanta Terra Cotta Co.* v. *Ga. Ry. & El. Co.*, 132 *Ga.* 537 (64 S. E. 563); *W. & A. R. Co.* v. *W. U. Tel. Co.*, supra. It is true that where one municipality condemns property in another municipality this will result in the latter municipality being deprived of its right to tax the property for municipal purposes (section 2 of the act; Code, § 11-202), and perhaps also the right to enforce police regulations in reference thereto (sections 1 and 8

of the act; Code, §§ 11-201, 11-208). If, however, the condemning municipality acts in good faith within the power granted under the terms of the statute, and there is a reasonable necessity for the appropriation of the property, the fact that the other municipality may be deprived of the right to tax or police the property so taken is merely the express result of the exercise of the power so granted, and does not constitute reason why the act should be construed as denying the power.

To summarize, our interpretation of the uniform airports act is that municipalities are thereby invested with absolute power to appropriate by condemnation land necessary for the establishment or expansion of airports and landing fields either within or without their respective boundaries. If it should appear that it is reasonably necessary for a municipality such as the City of Atlanta, in order to expand an airport owned and operated by it, to do so within the confines of an adjoining municipality, we are of the opinion that the act gives it such authority. The governing authorities of a municipality must exercise a reasonable discretion in this connection; and if it appears that they act in bad faith, and there is no necessity, reasonable or otherwise, for the invasion of the territory lying within the limits of another municipality, the courts will intervene and enjoin them. Thus no municipality is given the right to wantonly injure and destroy another municipality. Especially do we think that the uniform airports act, when taken in connection with the act of 1927 (Ga. Laws 1927, p. 779), authorizes the City of Atlanta to condemn property within the confines of another municipality. The act of 1927 expressly authorizes the City of Atlanta to acquire land for the establishment or expansion of an airport either within or without its territorial limits, provided that the land acquired be within twenty-five miles of the center of the city. Among other things, it is provided in this act that "Any land or locations leased or purchased or operated by the City of Atlanta as a municipal landing field . . shall be under exclusive jurisdiction and control of said city, *and no city or town in which said land may be located* shall have or exercise any police jurisdiction over same, nor shall such other municipality or town have authority to pass ordinances regulating the operation of said landing fields." Also, *"Nor shall any other municipality or town have any authority, although said land may be located within*

*its limits,* to charge or exact any license fees or occupation taxes for the operation of said landing field therein, or for the operation or conduct of any business .or occupation thereon." (Italics supplied.) Under the above provisions it is clear that this act authorized the City of Atlanta to establish or expand an airport within the confines of another municipality, provided the land to be acquired was within twenty-five miles of the center of the city. When the provisions of the uniform airports act are construed in connection with this act, it seems reasonable to hold that as to the City of Atlanta the right of condemnation given in the uniform airports act is as broad as the power already vested in said city in regard to acquiring land for the purpose of establishing or expanding an airport. The petition does not attempt to set up any abuse of discretion or bad faith on the part of the City of Atlanta in seeking to condemn land for the expansion of its airport within the City of College Park. Accordingly we must assume, the contrary not appearing, that there is a reasonable necessity for its. proposed action. Nor does the petition allege that the City of College Park is more than twenty-five miles from the center of the City of Atlanta. We are therefore of the opinion that the plaintiffs made no case for issuance of an injunction against the taking of their property.

The further objection is made that from allegations in the petition it appears that crossing the particular tracts of land sought to be condemned are several streets of the City of College Park, devoted to public use, and that the power of condemnation does not exist in respect to such property. It is to be noted that this point is made by the property owners, and not by the municipality of College Park, which is not a party to this case. In line with the principles announced in the foregoing divisions of the opinion, it must be held that the power of condemnation within the area of another municipality necessarily implies that such condemnation might extend to public streets of that municipality, subject of course to the regulation or supervision of the exercise of that power by the courts, if under a particular state of facts it might be shown to be unreasonable and done in bad faith. The rule in that connection has already been discussed. Since the petition contains no averment which would show that the power which we have held to exist is being unreasonably exercised, and none that would show reason

to protect the present public use to which the streets are alleged to be devoted, and since no allegation is made which would show any damage to the plaintiffs which could not be appropriately measured in the condemnation proceedings, we hold that these averments respecting the public streets afford no basis on which the plaintiffs may prevail. It follows that the judge did not err in dismissing the action on general demurrer.

The ruling made in the first division of this opinion represents the views of all of the members of the court. The second division is the opinion of the majority of the court, but does not accord with the views of the writer or of Mr. Justice Bell, who dissent therefrom. Our views on this question are as follows: There is no doubt, of course, that the General Assembly has the power to grant the authority here asserted by the City of Atlanta if it sees fit to do so. We are also aware of the fact that the terms of the act which authorize a municipality to condemn land "within or without" its geographical limits are in their broad and literal sense sufficient to authorize a municipality to condemn land without its borders and within the limits of another municipality. It does not necessarily follow, however, from the mere fact that the terms of the act are broad enough to include the power, that it should be held to have been the intention of the General Assembly to provide therefor. To illustrate, in *Chestatee Pyrites Co.* v. *Cavenders Creek Gold Mining Co.*, 119 *Ga.* 354 (supra), it was held that though a statute granted the power of eminent domain to *any* corporation engaged in mining, it did not confer the power on foreign corporations. The court said: "Our Code declares that 'any . . corporation who may be actually engaged in the business of mining' certain metals or minerals shall have the right to condemn private property. The language seems very broad,—broad enough to include both domestic and foreign corporations doing business of the designated kind in any State or country; but, as has been shown, statutes conferring the right of eminent domain must be construed strictly, and courts will never assume, in the absence of affirmative legislation, that it was intended to grant such powers to corporations over which the legislature had no control." Again, in *City Council of Augusta* v. *Ga. R. Co.*, 98 *Ga.* 161 (26 S. E. 499), it was held that although the City of Augusta had full authority to lay out and construct streets and condemn property for such

purpose, it had no authority to condemn the right of way of a railroad for the purposes of establishing a crossing, where to do so would practically extinguish the proper use by the railroad of the right of way. The fact that "the exercise of the second use, under such circumstances, would amount to a forfeiture of the first" was a sufficient reason to impel the court to hold that the General Assembly did not by the general terms of the grant intend to convey such right. For a similar ruling see *Georgia Northern Ry. Co.* v. *Moultrie,* 163 *Ga.* 513 (136 S. E. 415). Cases might be multiplied. The fact is that the language employed in the statute under consideration is that which would naturally have been used by the General Assembly for the purpose of merely giving the municipalities expressly any authority whatsoever to exercise the power beyond their boundaries, without any thought or purpose of permitting them to go within the limits of each other. The same or similar language is commonly employed by the General Assembly in general and special laws in reference to municipalities. For examples see Code, § 69-602; *City of Quitman* v. *Jelks,* 139 *Ga.* 238 (77 S. E. 76); *City of Cornelia* v. *Wells,* 181 *Ga.* 554 (183 S. E. 66); *Mayor &c. of Gainesville* v. *Dunlap,* 147 *Ga.* 344 (94 S. E. 247); *City Council of Augusta* v. *Mackey,* 113 *Ga.* 64 (38 S. E. 339).

Therefore we deem the question in the present case to be, are there sufficient reasons to assume that the General Assembly, in vesting in the several municipalities in this State the authority to condemn lands for airports either "within or without" their geographical limits, did not intend to authorize a municipality to go beyond its own limits and into the limits of another municipality? It must be admitted that the power of one municipality to condemn land in another municipality under any circumstances is an unusual and novel one. "A municipal corporation is a legal institution formed by charter from sovereign power, erecting a populous community of prescribed area into a body politic and corporate, with corporate name and continuous succession, and for the purpose and with authority of subordinate self-government and improvement and local administration of affairs of State." 43 C. J. 65. The very nature of municipal corporations makes it reasonable to assume that the General Assembly in vesting in each the power to determine the necessity for and location of airports and landing fields to serve the needs of their respective communities, and to thus

indirectly promote the commerce and general welfare of the State, prima facie intended to give the authorities of each municipality the exclusive right to determine whether an airport or landing field should be situated within its own boundaries. Even where municipalities lie contiguous to each other, it does not seem that it should be held, in the absence of express language or that which would admit of no other implication, that the General Assembly intended to establish a conflict of authority and jurisdiction between them within the boundaries of each other in the appropriation of land for airport purposes. It is to be noted that the act does not require municipalities or counties to establish or expand airports, but, in so far as appears from its terms, the matter remains in the legislative mind one principally of local concern and policy to be determined by local needs and limitations. There is no particular reason to believe that the General Assembly did not think that the governing authorities of one municipality were a sufficient exclusive agency to determine whether or not any land within its borders should be appropriated for such use. We agree that had the power been expressly granted it could not be abused; but we can not agree that under this statute the General Assembly intended to authorize a municipality, after determining that it needs and desires to establish or expand an airport, to condemn property in another municipality adjacent to its boundaries, even though in order to establish or expand such airport a plausible and reasonable necessity for doing so could be shown. This would be to say that the General Assembly has intended in certain cases to make the establishment or expansion of an airport by a condemning municipality of greater importance and concern to the State than virtually the continued existence of another municipality wherein the land is sought to be taken, depending upon the size of the latter and the amount of land necessary to be taken for the purpose. For in looking to other parts of the act for enlightenment we find that in section 2 of the act it is provided that any property acquired for the purpose of an airport shall be "acquired, owned, leased, controlled, or occupied for public, governmental, and municipal purposes." And in section 8, municipalities, counties, etc., acquiring or establishing airports or landing fields without their geographical limits are specifically "granted the right to enforce police regulations on such airports or landing fields." In the latter connection section 1

also authorizes municipalities, etc., to establish and "police," etc., airports "within or without the geographical limits of such municipalities." Thus the invaded municipality would in effect be stripped of its police powers over that portion of its territory taken, as well as the right to tax it for municipal purposes. See *Penick* v. *Foster,* 129 *Ga.* 217 (58 S. E. 773, 12 L. R. A. (N. S.) 1159, 12 Ann. Cas. 346); *Dispensary Commissioners* v. *Thornton,* 106 *Ga.* 106 (31 S. E. 733); Warwick County *v.* Newport News, 153 Va. 789 (151 S. E. 417); 26 R. C. L. 332, § 291.

Thus it is seen that the property appropriated would virtually be taken from within the boundaries of the invaded municipality and its boundaries would for all substantial purposes, though of course not actually, be changed. Was it the intention of the General Assembly to leave the powers of all the municipal corporations thus in conflict with each other? Or was it the intention that the powers of each as granted in its charter should be left intact and free from coercion or force by another or others? We think that any such confusion or conflict of power in such co-ordinate political subdivisions was not intended by the legislative body, and that it did not intend to authorize one municipality to condemn land in another municipality for airport purposes. The considerations mentioned seem to us to form strong reasons to assume that the General Assembly did not by the terms used in this act intend to grant to all municipalities such unusual power; but that on the contrary, if they had so intended, they would have either used express language or that which would admit of no other implication. It is well known that we have not reached the point in this State of a congestion of municipalities, and that surrounding the limits of perhaps each and every one lies abundant property which may be devoted to airports and landing fields, which does not lie within the confines of another municipality. It was, we believe, the intention of the General Assembly to authorize municipalities to appropriate such territory, and not that lying within another municipality. Concerning the act of 1927 amending the charter of the City of Atlanta, we need only say that while that act by necessary implication grants to that city the authority to *acquire* land in an adjoining municipality, it did not grant the authority to *condemn* land therein for such purpose. It is indeed significant to us that the General Assembly did not see fit in that act to grant

to the City of Atlanta the unusual right to invade an adjoining municipality by condemnation of land situate therein. If we correctly understand the argument of counsel for the City of Atlanta in the present case, as contained in the brief filed, it is not insisted that the act of 1927 adds anything to the power of the city to condemn land which is provided for in the uniform airports act.

Attention is called to the fact that the act authorizes one county to condemn land in another county for airport purposes. This is manifestly true, for counties are authorized to condemn land "within and without" their geographical limits, and a county can not condemn land without its borders without going into another county. It is not contended that like reasoning is applicable to the provision in regard to municipalities, but it is suggested that since the General Assembly authorized one county to condemn land in another county it is reasonable to assume that they were of like mind in reference to municipalities. The argument is not wholly without force, but it is not sufficiently strong to overcome what we believe to be the most reasonable view of the act.

The case of *Lee County* v. *Smithville,* 154 *Ga.* 550 (supra), is cited and much relied on by counsel for the city. It was there held that a county acting in co-operation with the State Highway Department could lay out a State-aid road within the confines of a city without the consent and over the protest of the municipality. That ruling is of course sound, but we are unable to see how it logically follows therefrom that the present act should be construed as contended for by the city. The court there reasoned that although "one system is generally held not to encroach upon another system," and accordingly as a general rule a statute authorizing counties to establish and lay out roads would not authorize a county to lay out a road in a municipality having authority to lay out and establish streets within its borders (*Board of Commissioners* v. *Americus,* 141 *Ga.* 542, 550, 81 S. E. 435; *Almand* v. *Atlanta Consolidated St. Ry. Co.,* 108 *Ga.* 417, 34 S. E. 6; *Commissioners of Polk County* v. *Cedartown,* 110 *Ga.* 824, 36 S. E. 50; *Marshall* v. *Floyd County,* 145 *Ga.* 112, 88 S. E. 943), nevertheless under the act of 1919, reorganizing the State Highway Department and providing for the establishment of State-aid roads (Ga. Laws 1919, p. 242), the necessary implication was that a county acting in co-operation with and under the supervision of

the State Highway Department could lay out and establish a State-aid road within a municipality, without the consent and over the protest of the municipality. Of course if the necessary implication of the present act was that one municipality could condemn land in another municipality for the establishment or expansion of an airport, we would not hesitate so to hold; but our view is that the act carries no such implication. A ruling that a municipality has the right, under the uniform airports act, to condemn land in another municipality for the purpose of establishing or expanding an airport can not be logically based on the mere fact that this court has held that under the act of 1919 a county acting in co-operation with the State Highway Department could lay out and establish a road within a municipality without its consent.

The writer and Mr. Justice Bell are of the opinion that the petition set out a cause of action, and should not have been dismissed on demurrer.

*Judgment affirmed. All the Justices concur, except Reid, C. J., and Bell, J., who dissent.*